Jeffrey Michael ST. GEORGE,
Jr., Appellant

v.

The STATE of Texas, State.

Nos. 2–03–421–CR, 2–03–422–CR.

Court of Appeals of Texas,
Fort Worth.

May 25, 2006.

Robert Kersey, Granbury, for Appellant.

R. Kelton Conner, Co. Atty., and Stuart V. Neal, Granbury, for Appellee.

## OPINION ON REHEARING

ANNE GARDNER, Justice.

We granted the State's motion for rehearing en banc. The case was reargued on November 18, 2004. On December 16, 2005, we withdrew our opinion and judgment of August 31, 2004. We substitute the following.

Appellant Jeffrey Michael St. George, Jr. was charged with the offenses of possession of marijuana and failure to identify as a fugitive. Appellant filed two motions to suppress, which were denied following a hearing. Appellant subsequently pleaded guilty to both charges and received deferred adjudication community supervision. The trial court granted Appellant permission to appeal its rulings denying his motions. In two issues, Appellant contends that the trial court erred by denying his motions to suppress because his interrogation and prolonged detention as a passenger of a vehicle subject to a routine traffic stop violated the Fourth Amendment to the United States Constitution. *See* U.S. CONST. amend. IV.

On the evening of October 21, 2002, Hood County Sheriff's Deputies Sonny Frisbee and Robert Young stopped a vehicle traveling on State Highway 377 toward Fort Worth. The basis for the stop was an inoperative license plate light. Appellant was a passenger in the vehicle, which was driven by his mother. The stop was videotaped by the camera inside the patrol vehicle and audiotaped by a microphone worn by Deputy Young.

At the suppression hearing, Deputy Young testified that Deputy Frisbee made contact with the driver when they made the stop and then asked Appellant if he had any identification with him. He thought Appellant gave Deputy Frisbee the name of John Christopher St. George and a date of birth of 12/16/75. The name came back "no record," Deputy Young said. When they went back to the car to verify that they had the correct information, the name "started to change." Ultimately, the officers learned that Appellant's true name was Jeffrey Michael St. George and that he had six outstanding warrants. Deputy Frisbee arrested him and found marijuana in a cigarette package in his pocket in the course of a pat-down search.

As to what basis the officers had to detain Appellant, Deputy Young testified that Appellant "wasn't detained." Deputy Young stated, "He was a passenger.... He hadn't committed an offense.... Absolutely [he was free to go.]" As to why he questioned Appellant, Deputy Young responded that he did not consider the contact as investigatory; the purpose was "just to talk." However, he did have other reasons, he said: Appellant was slouched down and did not make eye contact, "[s]o he appeared nervous."

Deputy Frisbee authenticated the videotape of the stop as an accurate depiction of the stop. The events that transpired as shown on the videotape are summarized as follows. The times are the minutes and seconds elapsed after the first image appears on the videotape.

1:35 Officers activate their lights behind a vehicle and both vehicles come to a complete stop. One officer says: "Is that a guy? ... Let's see what's up."

1:58 Deputy Frisbee walks to driver's side of stopped vehicle and informs Appellant's mother that she has been stopped because her license plate light is out. Without pausing, he asks Appellant through the driver's window

whether he has any identification with him. Appellant responds, "No."

2:25 Deputy Young has approached Appellant's side of the vehicle and engages in an inaudible conversation with Appellant.

3:07 Deputy Frisbee also walks to Appellant's side of the vehicle and speaks with Appellant; the audio cuts out. The mother exits the vehicle, and Deputy Young shows her that her license plate light is out and tells her she will be given a warning ticket and it "will just take a second."

3:52 Deputies Young and Frisbee meet at the front of the patrol vehicle. Deputy Frisbee tells Deputy Young that Appellant has identified himself as "John St. George" and is "nervous."

4:03 Deputy Frisbee returns to the patrol vehicle; Deputy Young returns to Appellant's side of the vehicle and addresses the mother through Appellant's side window, telling her it will "just be a few minutes" and that they are just going to write a warning ticket. Deputy Young then also returns to the patrol vehicle.

4:40 Only background noises for a minute and then the audio cuts out for another minute.

6:25 The dispatcher is heard over the patrol vehicle's radio informing the deputies that the mother has a valid license and that is it is "clear." The dispatcher also informs the deputies that she could locate neither a license nor warrants for a John St. George with a date of birth of 12/16/75.

9:00 Deputy Young can be seen standing by the patrol vehicle, apparently waiting on Deputy Frisbee to finish writing the ticket.

9:37 Deputy Young approaches Appellant and asks Appellant if he has "ever" had a driver's license. Appellant replies that he has. Deputy Young asks him if it is expired. Appellant answers, "Yeah. I don't drive around."

9:43 At the same time, Deputy Frisbee approaches the driver. He hands her the warning ticket and appears to be explaining it to her.

10:03 Deputy Young informs Appellant that they could not find a driver's license when they checked and asks if his license is expired. Deputy Young asks Appellant for his middle name and Appellant replies that it is "Michael." Deputy Young asks the dispatcher to check for a John Michael St. George.

10:18 Deputy Young asks Appellant for his date of birth again. Appellant responds: "Is there a problem?" Deputy Young replies, "You said you had a license, but didn't have it with you, but they didn't find it."

10:42 The dispatcher interrupts that she has found a "John Christopher St. George" with a date of birth of 12/16/82. Deputy Young asks Appellant "It's not Christopher, is it?" Appellant replies, "That's what I said." Deputy Young responds, "You said Michael." Appellant replies, "No."

10:58 Deputy Young is still standing by the passenger door as he asks the dispatcher to go ahead and check the name that she has found.

11:04 Deputy Frisbee walks to the passenger's side of the vehicle, where he remains standing next to Appellant's door while Deputy Young walks to the driver's side and asks the driver if the passenger is her son, and she says "yes." Deputy Young asks the mother twice whether his middle name is Michael or Christopher, and she replies twice that his middle name is Michael.

11:36 Deputy Young returns to the passenger's side where Deputy Frisbee is still standing and asks Appellant, "So Christopher is your middle name?" Appellant replies, "Yes." Deputy Young then informs the driver that Appellant has just stated that his middle name is Christopher. His mother responds clearly that his name is "Jeffrey Michael."

11:51 Deputy Young asks Appellant, "What's wrong?" Appellant responds, "The problem is you're questioning someone who is not even driving a car and just sitting here and she got her ticket and there shouldn't be any other problem here." Deputy Young responds, "It's just because you're nervous." Deputies Young and Frisbee continue to stand in front of Appellant's door and engage in further conversation with both occupants. Audio cuts out for 5 seconds.

12:19 The audio resumes with both occupants again telling the deputies that Appellant's middle name is Michael.

12:28 Deputy Young finally tells the dispatcher that the middle name of the passenger is going to be Michael. Deputy Young tells Appellant that they are just making sure he is who he says he is and asks him if he has any form of picture identification, to which Appellant responds, "No."

13:13 Both deputies continue to stand in front of the passenger side door. Deputy Young leans down to speak with Appellant; the audio cuts out.

14:13 Once the audio returns, Deputy Young states to Appellant, "Just be sure you give us the right name.... As soon as we get a return on that we'll be all done."

14:24 The dispatcher informs the deputies that she is unable to locate a driver's license for "John Michael St. George" with a date of birth of 12/16/75. Deputy Young asks Appellant again if the date of birth he has given is correct, and then asks, "What's the real date of birth?" Appellant states that it is 12/6/77.

14:42 Deputy Young requests that dispatch run "John Michael St. George" with the date of birth of 12/6/77.

15:05 Deputy Young again leans down to speak with Appellant and asks if he has "tickets out or anything"; the audio again cuts out.

15:37 The audio resumes as Deputy Young stands up and notifies the dispatcher to run a "new" name, "Jeffrey Michael St. George" with date of birth 12/6/77. Deputy Young informs Appellant, "As long as we get a return on his license and everything's fine, you're not going to get in trouble for all the different names, even though you can. It's failure to identify." Deputy Young states, "We just want to find out your right name. It's all we are interested in."

19:06 The dispatcher informs the deputies that she has found a Jeffrey Michael St. George with outstanding warrants for speeding and no insurance. Appellant is told to exit the vehicle and is arrested and handcuffed for the warrants. During a pat-down search, marijuana is found in a pack of cigarettes in Appellant's pocket.

Appellant challenges the denial of his motions to suppress evidence of the false identifications in response to the requests for his identity and the contraband obtained as the result of the search incident to his arrest.

■■■ We review the trial court's rulings on a motion to suppress under a bifurcated standard of review.[1] In review-

---

1. *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim.App.2005); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex.Crim.App.2000).

ing the trial court's decision, we do not engage in our own factual review.[2] The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony.[3] Therefore, we give almost total deference to a trial court's determination of historical facts.[4]

■■■ In this case, the trial court did not make explicit findings of historical fact. We therefore review the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact supported by the record.[5] However, we review de novo the determination of whether a specific search or seizure was "reasonable" as an ultimate question of Fourth Amendment law.[6]

■■■ The Fourth Amendment forbids unreasonable searches and seizures.[7] "The right of the people to be secure in their persons" guarantees individuals a reasonable expectation of privacy, whether in their homes or on the street.[8] The temporary detention of individuals during a traffic stop has been characterized as a "seizure" of persons within the meaning of the Fourth Amendment.[9] Routine traffic stops are analogous to investigative detentions and are governed by *Terry v. Ohio*.[10] Thus, our framework for determining the reasonableness of an investigative detention based on a traffic stop is provided by *Terry*, under which police officers may stop and briefly detain persons reasonably suspected of criminal activity on less information than is constitutionally required for probable cause to arrest.[11]

■■■ The State bears the burden of establishing the reasonableness of a warrantless detention.[12] An investigative detention is reasonable only if the officer has "specific articulable facts," which, premised upon the officer's experience and personal knowledge and coupled with the logical inferences from those facts, warrant the intrusion on the detainee.[13] The officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch."[14]

2. *Romero v. State,* 800 S.W.2d 539, 543 (Tex. Crim.App.1990); *Best v. State,* 118 S.W.3d 857, 861 (Tex.App.-Fort Worth 2003, no pet.).

3. *State v. Ross,* 32 S.W.3d 853, 855 (Tex.Crim. App.2000); *State v. Ballard,* 987 S.W.2d 889, 891 (Tex.Crim.App.1999).

4. *Carmouche,* 10 S.W.3d at 327; *Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App. 1997).

5. *Ford,* 158 S.W.3d at 493; *Carmouche,* 10 S.W.3d at 327–28.

6. *Kothe v. State,* 152 S.W.3d 54, 61 (Tex.Crim. App.2004); *Carmouche,* 10 S.W.3d at 327–28; *Guzman,* 955 S.W.2d at 87.

7. *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968) (citing *Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960)).

8. *Id.* at 8–9, 88 S.Ct. 1868.

9. *See Kothe,* 152 S.W.3d at 61 & n. 19 (discussing standing of passenger to challenge constitutionality of detention); *United States v. Brigham,* 382 F.3d 500, 506 (5th Cir.2004). The Supreme Court has not specifically held that a passenger, as distinguished from the driver, is seized at the moment of the stop but has recognized that, as a practical matter, any passengers are stopped by virtue of the stop of the vehicle. *Maryland v. Wilson,* 519 U.S. 408, 412–14, 117 S.Ct. 882, 885–86, 137 L.Ed.2d 41 (1997).

10. *Berkemer v. McCarty,* 468 U.S. 420, 436, 439, 104 S.Ct. 3138, 3148, 3150, 82 L.Ed.2d 317 (1984) (noting traffic stop "significantly curtails the 'freedom of action' of the driver and the passengers" alike); *United States v. Valadez,* 267 F.3d 395, 397–98 (5th Cir.2001).

11. *Terry,* 392 U.S. at 21–22, 88 S.Ct. at 1880.

12. *Ford,* 158 S.W.3d at 492.

13. *Id.* at 492, 493–94.

14. *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989).

*Terry* dictates a two-pronged analysis to determine reasonableness: first, whether the officer's action was justified at its inception; and second, whether it was reasonably related in scope to the circumstances that justified the interference in the first place.[15] "Reasonableness" under Fourth Amendment standards is a fact-specific inquiry "measured in 'objective terms by examining the totality of the circumstances.'"[16] To determine "reasonableness," we balance the legitimate public interest served against the individual's right to be free of arbitrary detentions and intrusions.[17]

Appellant does not question the validity of the initial stop. Therefore, we focus on *Terry's* second prong. Appellant challenges the extension of the investigation regarding the stop to him as a mere passenger, contending that questioning him as to his identity and checking for outstanding warrants without separate reasonable suspicion as to him were beyond the scope of the purpose of the stop and unreasonably prolonged its duration.

The "scope" of an investigative detention is limited by the second prong of *Terry* both as to the duration of the detention and as to the manner in which the investigation is carried out. "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop [and] ... the investigat[ory] methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion...."[18] A detention that is not temporary nor reasonably related in scope to the circumstances that justified the stop is unreasonable and, thus, violative of the Fourth Amendment.[19]

To be reasonably related in scope, the investigation must be limited by the justification for the stop.[20] An investigative detention must be "strictly circumscribed by the exigencies which justify its initiation."[21] A seizure reasonable at its inception may nevertheless violate the Fourth Amendment by its excessive intensity and scope.[22] The nature of questioning during the latter part of a detention may, itself, indicate that the justification for the original detention no longer exists.[23] And a seizure lawful at its inception may nevertheless violate the Fourth Amendment by the "manner of execution" of the investigation.[24]

To determine whether the duration of an investigative detention is rea-

**15.** *Terry*, 392 U.S. at 19–20, 88 S.Ct. at 1879; *Davis v. State*, 947 S.W.2d 240, 242 (Tex. Crim.App.1997).

**16.** *Kothe*, 152 S.W.3d at 63 (quoting *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 419, 136 L.Ed.2d 347 (1996)).

**17.** *Id.* (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977) (per curiam)).

**18.** *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983); *see also United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 683, 83 L.Ed.2d 604 (1985) (examining under *Terry* both "the length and intrusiveness of the stop and detention").

**19.** *Davis*, 947 S.W.2d at 242–43.

**20.** *Terry*, 392 U.S. at 29, 88 S.Ct. at 1884.

**21.** *Id.* at 25–26, 88 S.Ct. at 1882; *see also Knowles v. Iowa*, 525 U.S. 113, 118, 119 S.Ct. 484, 488, 142 L.Ed.2d 492 (1998) (invalidating statute authorizing full search of automobile incident to citation for speeding since "[n]o further evidence of excessive speed[ing] was going to be found" once vehicle was stopped and citation issued).

**22.** *Davis*, 947 S.W.2d at 243.

**23.** *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir.1993).

**24.** *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 837, 160 L.Ed.2d 842 (2005).

sonable, the relevant question is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly...." [25] The Supreme Court has rejected any rigid time limit on the duration of a valid *Terry* stop.[26] To determine whether the duration is reasonable, "[w]e look to the scope of the stop...." [27] The permissible duration is measured by the time reasonably necessary to complete a brief investigation of the matters that justified the stop.[28] Specifically, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." [29]

■■■■ Once the original purpose for the stop is concluded, the detention must end.[30] A detention may not be unnecessarily prolonged solely in hopes of finding evidence of some other crime.[31] The stop may not be used as a "fishing expedition for unrelated criminal activity." [32] But if reasonable suspicion of additional criminal activity arises in the course of a stop and before the purpose of the stop is fulfilled, then a continued detention may be justified until the new suspicion has been confirmed or dispelled.[33] Thus, an investigation pursuant to a traffic stop "may last as long as is reasonably necessary to effectuate the purpose of the stop, including the resolution of reasonable suspicion, supported by articulable facts within the officer's professional judgment, that emerges during the stop." [34]

■■■■ Appellant first contends that, since the traffic stop was based only upon violation of a traffic law by the driver, the officers had no authority to request identification from him initially, as a mere passenger, absent reasonable suspicion to extend the scope of the investigation to him. We disagree. During a routine stop for a

**25.** *United States v. Sharpe,* 470 U.S. 675, 685–86, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985).

**26.** *Kothe,* 152 S.W.3d at 64 (citing *Sharpe,* 470 U.S. at 685–86, 105 S.Ct. at 1575 (rejecting a per se rule that a twenty-minute detention was too long under the circumstances)).

**27.** *United States v. Machuca–Barrera,* 261 F.3d 425, 432 (5th Cir.2001).

**28.** *Id.; see United States v. Sandoval,* 29 F.3d 537, 542–43 (10th Cir.1994) (holding that prolonged detention beyond time necessary to write citation was unreasonable absent reasonable suspicion of criminal activity); *People v. Cox,* 202 Ill.2d 462, 270 Ill.Dec. 81, 782 N.E.2d 275, 280–81 (2002) (detention for fifteen minutes to write out ticket while awaiting arrival of drug-sniffing dog called at outset of stop held unreasonable absent reasonable suspicion); *Haas v. State,* 172 S.W.3d 42, 50 (Tex.App.-Waco 2005, pet. ref'd) (citing *United States v. Kelley,* 981 F.2d 1464, 1470 (5th Cir.1993)) (noting, under appropriate circumstances, extensive questioning about matters wholly unrelated to routine traffic stop may violate Fourth Amendment).

**29.** *Caballes,* 543 U.S. at 407, 125 S.Ct. at 837.

**30.** *Kothe,* 152 S.W.3d at 64; *Davis,* 947 S.W.2d at 245 (purpose of stop for suspicion of DWI effectuated and detention should have ended when officer determined driver was merely tired).

**31.** *See Kothe,* 152 S.W.3d at 64; *Valadez,* 267 F.3d at 398 (continued questioning on unrelated matter and computer check on warrants and criminal history impermissible where officer's suspicions on which stop was based had already been dispelled); *Machuca–Barrera,* 261 F.3d at 432 (once reason for stop has been satisfied, detained individual must be free to leave).

**32.** *Davis,* 947 S.W.2d at 243 (quoting *Robinette,* 519 U.S. at 41, 117 S.Ct. at 422 (Ginsberg, J., concurring)).

**33.** *See id.* at 244; *Perales v. State,* 117 S.W.3d 434, 439 (Tex.App.-Corpus Christi 2003, pet. ref'd); *see also United States v. Jones,* 234 F.3d 234, 241 (5th Cir.2000); *United States v. Dortch,* 199 F.3d 193, 200 (5th Cir.1999).

**34.** *Brigham,* 382 F.3d at 512.

traffic violation by the driver, officers may question the driver; request his license, insurance papers, and information on ownership of the vehicle; and ask about the driver's destination and the trip's purpose.[35] And the court of criminal appeals recently noted that "the detaining officer may also question the vehicle's occupants regarding their identities, travel plans, and ownership of the vehicle." [36] But the court in that case was addressing the scope of an investigative detention of a driver, not a passenger as to whom the officer had no separate reasonable suspicion of criminal activity.

The State relies on numerous court of criminal appeals cases for the proposition that there is no prohibition against requesting identification from passengers.[37] But the State's reliance on those cases also begs the question because, in each of those cases, the officers had previously developed a separate reasonable suspicion for investigatory detention of the passengers before questioning them. Questioning the passengers was justified in each case based upon articulable facts creating reasonable suspicion implicating *all* occupants in criminal activity.

■■■ Indeed, the State acknowledges that the court of criminal appeals did not specifically say in those cases that an officer may identify a passenger, and it cites no case on the question raised here: whether a passenger who is simply a passive occupant may be questioned regarding his identity during a routine traffic stop absent reasonable suspicion that he was implicated in the reason for the stop or that other criminal activity was afoot.[38]

---

**35.** *Kothe,* 152 S.W.3d at 63; *Davis,* 947 S.W.2d at 245 n. 6; *Freeman v. State,* 62 S.W.3d 883, 888 (Tex.App.-Texarkana 2001, pet. ref'd); *see also Smith v. State,* 840 S.W.2d 689, 692 (Tex.App.-Fort Worth 1992, pet. ref'd); *Petty v. State,* 696 S.W.2d 635, 638–39 (Tex.App.-Dallas 1985, no pet.); 4 WAYNE R. LaFAVE, SEARCH & SEIZURE § 9.3(c), at 378–79, 381, 383 (4th ed.2004) (noting routine computer check on driver serves objectives related to reason for stop in ensuring that only those qualified to do so are permitted to operate vehicles on public roads).

**36.** *Kothe,* 152 S.W.3d at 64 n. 36 (citing *United States v. Zabalza,* 346 F.3d 1255, 1259 (10th Cir.2003)); *cf. Freeman,* 62 S.W.3d at 888 (holding officer's request to see both driver's and passenger's licenses and questioning of both as to destination and purpose of trip not unreasonable).

**37.** *See, e.g., Duff v. State,* 546 S.W.2d 283, 286–87 (Tex.Crim.App.1977) (passenger reeked of marijuana smoke and gave conflicting story to that of driver before being asked for identification); *Tardiff v. State,* 548 S.W.2d 380, 381–82 (Tex.Crim.App.1977) (question by one passenger about person wanted by police, weaving back and forth, and smell of marijuana on both passengers); *Borner v. State,* 521 S.W.2d 852, 854–55 (Tex.

Crim.App.1975) (passenger observed attempting to stuff something between seats); *Wood v. State,* 515 S.W.2d 300, 305 (Tex.Crim.App. 1974) (passenger appeared intoxicated); *Leonard v. State,* 496 S.W.2d 576, 577 (Tex. Crim.App.1973) (officer smelled odor of marijuana coming from vehicle as he bent down to look at passenger); *see also Rhodes v. State,* 945 S.W.2d 115, 116–17 (Tex.Crim.App.), *cert. denied,* 522 U.S. 894, 118 S.Ct. 236, 139 L.Ed.2d 167 (1997) (during a chase, officers saw passenger open vehicle door and drop a Crown Royal bag, typically used to contain illegal drugs, out of vehicle).

**38.** The Supreme Court recently reaffirmed that, where reasonable suspicion *does* exist, "[o]ur decisions make clear that questions concerning a suspect's identity are a routine and accepted part of many *Terry* stops." *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt County,* 542 U.S. 177, 186–88, 124 S.Ct. 2451, 2458–59, 159 L.Ed.2d 292 (2004) (citing *United States v. Hensley,* 469 U.S. 221, 229, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985)). "[I]f there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional infor-

▆ To answer this question, we start with the proposition that "passengers in an automobile are subject to temporary investigative detentions in the same manner as pedestrians." [39] "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting some questions to him if the person is willing to listen, or by offering in evidence ... his voluntary answers to such questions." [40] Mere questioning is neither a search nor a seizure.[41] "[D]etention, not questioning, is the evil at which *Terry's* second prong is aimed." [42] As the Supreme Court stated, "[s]ince *Terry*, we have held repeatedly that mere police questioning does not constitute a seizure." [43]

▆ Therefore, we hold that merely asking for a passenger's identity or identi- fication during a routine traffic stop does not require separate reasonable suspicion as to the passenger.[44]

▆ It does not follow, however, that answers may be compelled. "The person approached ... need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go his way." [45] The appropriate inquiry is not whether the occupant of a vehicle is free to leave the scene but "whether a reasonable person would feel free to decline the officer's requests or otherwise terminate the encounter." [46]

▆ Thus, even when they have no basis for reasonable suspicion, officers may ask questions of passengers and request identification, "as long as the police do not convey a message that compliance with their requests is required." [47] It is "settled principle that while police have the

mation." *Id.* (quoting *Hayes v. Florida*, 470 U.S. 811, 816, 105 S.Ct. 1643, 1647, 84 L.Ed.2d 705 (1985)).

39. *Rhodes*, 945 S.W.2d at 117 (citing *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (extending *Terry*, which involved stop of citizens on street, to occupant of vehicle)).

40. *Gearing v. State*, 685 S.W.2d 326, 328 (Tex. Crim.App.1985) (quoting *Royer*, 460 U.S. at 497, 103 S.Ct. at 1324), *overruled on other grounds by Woods v. State*, 956 S.W.2d 33, 38 (Tex.Crim.App.1997).

41. *Shabazz*, 993 F.2d at 436.

42. *Id.*

43. *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991).

44. *Accord State v. Hernandez*, 64 S.W.3d 548, 552 (Tex.App.-Texarkana 2001, no pet.) (holding that questioning of passengers on bus, including asking for driver's licenses and tickets, constituted consensual encounter and passengers were free to decline to answer questions); *see also People v. Jackson*, 39 P.3d 1174, 1178 (Colo.2002) (holding officer's request for passenger's identification during

stop constituted lawful consensual encounter); *People v. Gonzalez*, 204 Ill.2d 220, 273 Ill.Dec. 360, 789 N.E.2d 260, 270 (2003) (holding officer's request for passenger's identification not unreasonable although unrelated to reason for stop, where it did not prolong detention and passenger was under no obligation to answer); *State v. Riley*, 501 N.W.2d 487, 489 (Iowa 1993) (holding asking passenger for identification not improper).

45. *Gearing*, 685 S.W.2d at 329 (citing *Terry*, 392 U.S. at 32–33, 88 S.Ct. at 1885–86 (Harlan, J., concurring)); *see also United States v. Drayton*, 536 U.S. 194, 201, 122 S.Ct. 2105, 2110, 153 L.Ed.2d 242 (2002) (holding reasonable suspicion not required provided police do not induce cooperation by coercive means).

46. *Bostick*, 501 U.S. at 436, 111 S.Ct. at 2387 (holding that if random, suspicionless questioning of bus passengers for inspection of identification and tickets was "consensual encounter," it was not a violation of passengers' Fourth Amendment rights).

47. *Id.* at 435, 111 S.Ct. at 2386; *see State v. Velasquez*, 994 S.W.2d 676, 678 (Tex.Crim. App.1999).

right to request citizens to answer voluntarily questions concerning unsolved crimes they have no right to compel them to answer." [48]

█ Appellant was asked within seconds of the traffic stop whether he had identification with him and, according to the officers, was asked to identify himself. He voluntarily provided a name to the deputies, albeit a false one. Appellant does not suggest that the initial request was coercive, nor does the videotape indicate that the deputies conveyed an initial message that compliance was required. Therefore, the mere questioning of Appellant and his answer as to his identity in the course of the initial stop may be termed a "consensual encounter" and did not contravene the Fourth Amendment.

█ We now turn to the crux of Appellant's appeal, that the continued questioning regarding his identity after the purpose of the stop was complete was unrelated to the purpose of the traffic stop and unreasonably prolonged its duration, thereby failing the "scope" requirement of *Terry*. The State concedes that the officers continued to question Appellant about his identity after the traffic stop for the nonfunctioning license plate lamp was complete.

We note that, at the suppression hearing, Deputy Young opined that Appellant was not "detained," that he was "[a]bsolutely [free to go.]" But the conduct of the officers and their responses to each of Appellant's complaints about the continued questioning belie that conclusion by Deputy Young. It is clear from the videotape

that Appellant's continuing encounter with Deputies Young and Frisbee was in no sense "consensual." Even the State does not disagree that the questioning escalated into an investigatory detention focused on Appellant to demand his identity from the moment Deputy Young went back to Appellant's side of the stopped vehicle to ask whether he had ever had a license.

For ten minutes after the warning ticket was handed to the mother, the officers blocked Appellant's door and stated at least four times that "this has to be resolved," "we [have to] make sure, you know, you are who you say you are," "as soon as we get a return ... we will be all done," and "we just want to find out your right name." The message that Appellant was being detained until he identified himself was clearly conveyed. The deputies were not simply inquiring, they were demanding Appellant's identity with the promise of continued detention until they got it. This they could not do, absent reasonable suspicion.

This issue was decided against the State in *Brown v. Texas*, in which the Supreme Court ruled that Texas Penal Code section 38.02(a), as enacted by the Texas legislature in 1974, was unconstitutional precisely because it allowed an officer to stop and demand identification of an individual without any specific basis or belief that he was involved in criminal activity. [49] The Court reasoned that, in the absence of any basis for suspecting Brown of misconduct, the balance between the public interest and Brown's right to personal security and privacy tilts in favor of freedom from police interference. [50]

---

48. *Kolender v. Lawson*, 461 U.S. 352, 360 n. 9, 103 S.Ct. 1855, 1859 n. 9, 75 L.Ed.2d 903 (1983) (quoting *Davis v. Mississippi*, 394 U.S. 721, 727 n. 6, 89 S.Ct. 1394, 1397 n. 6, 22 L.Ed.2d 676 (1969)).

49. 443 U.S. 47, 52–53, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979); *see also Hull v. State*,

613 S.W.2d 735, 740 (Tex.Crim.App.1981) (holding arrest of individual for refusal to identify violated Fourth Amendment absent particularized and objective suspicion of criminal activity on his part).

50. *Brown*, 443 U.S. at 52, 99 S.Ct. at 2641.

The Texas statute under which Brown was stopped and required to identify himself was, the Supreme Court recognized, designed to advance a weighty social objective: prevention of crime in large metropolitan areas. But assuming that this purpose is served to some degree by stopping and demanding identification from an individual without a specific basis to believe he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it. When such a demand is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits.[51]

The deputies' continued detention to investigate Appellant—after the purpose of the traffic stop was complete—solely to demand that he identify himself was illegal under the Fourth Amendment unless Appellant was then "lawfully detained" based upon articulable facts establishing reasonable suspicion developed during the course of the initial stop.[52]

The State does not disagree. Rather, it contends that, during the course of the initial stop, the officers did develop separate reasonable suspicion that Appellant was engaged in or soon would engage in criminal activity, justifying his continued detention and questioning after the purpose of the initial stop was complete.

The State first points to the deputies' observation of Appellant's "nervousness." However, it is well settled that nervousness alone is not enough to amount to reasonable suspicion.[53] The State acknowledges that nervousness cannot be the only factor. Thus, the State further argues that Appellant's continued detention was also justified because he was committing the offense of "failure to identify" when he gave a false name during the first few seconds of the stop.[54] While the trial court agreed during the suppression hear-

51. *Id.* at 52, 99 S Ct. at 2641; *see also Hiibel,* 542 U.S. at 184, 187–88, 124 S.Ct. at 2457, 2459 (distinguishing Texas statute invalidated in *Brown,* upholding Nevada statute requiring individual to provide name in the course of a valid *Terry* stop based upon specific objective facts establishing reasonable suspicion). After the Court's ruling, section 38.02(a)-(b) was amended, effective September 1987, to read as follows:

> (a) A person commits [the] offense [of failure to identify] if he intentionally refuses to report or give his name, residence address, or date of birth to a peace officer who has lawfully arrested the person and requested the information.
> (b) A person commits an offense if he reports or gives a false or fictitious name, residence address, or date of birth to a peace officer who has lawfully arrested the person or who has requested the information from a person that the peace officer has good cause to believe is a witness to a criminal offense.

Act of May 29, 1987, 70th Leg., R.S., ch. 869, 1987 Tex. Gen. Laws 2944 (amended 1993) (current version at TEX. PENAL CODE ANN. § 38.02 (Vernon Supp.2005)).

52. *See Sims v. State,* 84 S.W.3d 805, 809–10 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (defendant not "lawfully detained" within meaning of statute where officer lacked specific articulable facts at time defendant misidentified himself to create reasonable suspicion connecting him with criminal activity).

53. *See, e.g., Holladay v. State,* 805 S.W.2d 464, 472–73 (Tex.Crim.App.1991), *overruled on other grounds by Hunter v. State,* 955 S.W.2d 102 (Tex.Crim.App.1997); *Glass v. State,* 681 S.W.2d 599, 602 (Tex.Crim.App. 1984); *LeBlanc v. State,* 138 S.W.3d 603, 608 n. 6 (Tex.App.-Houston [14th Dist.] 2004, no pet.).

54. Under section 38.02 of the Penal Code, "[a] person commits an offense if he intentionally gives a false or fictitious name, residence address, or date of birth to a peace officer who has ... lawfully detained the person." TEX. PENAL CODE ANN. § 38.02(b)(2). The offense is elevated from a class B to a class A misdemeanor if the person was a fugitive at the time of the offense. *Id.* § 38.02(d).

ing that, absent reasonable suspicion, the officers could not properly have continued to detain and question Appellant regarding identity, he also agreed with the State's argument that the initial misidentification constituted an objective basis to continue the investigation under the totality of the circumstances.

But the timing of the misidentification is significant. The officers did not know the name was a misidentification, either when Appellant volunteered it or when they returned to continue questioning him after issuing the warning ticket. The giving of the false name—when the officers did not know it was false—could not have furnished reasonable suspicion to entitle them to investigate further.[55]

While it is true that the dispatcher reported "no record" on the license and warrants check for the name first provided by Appellant, no evidence indicates how or why the absence of a record, even with nervousness, provided reasonable suspicion that an offense was being or would be committed. When asked at the suppression hearing about the meaning of the absence of a record of any license for Appellant, Deputy Young testified only, "Whatever that means, there's no record."[56] Moreover, the State does not contend, nor did Deputy Young testify, that "no record" raised a suspicion of any mis-

identification or other wrongdoing, and we would only be speculating to so infer.

The other facts upon which the State relies for reasonable suspicion were, first, the conflicting names given by Appellant and, second, the discovery of the outstanding warrants for Appellant's arrest. But the conflicting names did not emerge until over ten minutes into the stop, after issuance of the warning ticket, after further questioning, and after the dispatcher reported the discovery of a "John Christopher St. George." By that time, the purpose of the stop was resolved and the driver and Appellant should already have been released. And the outstanding warrants discovered at the end of the investigative detention were the consequence of the investigative detention, not the basis for it. Neither the conflicting names nor the outstanding warrants could somehow relate back to provide articulable facts for the officers to justify detaining Appellant when those facts arose as a result of the original detention. We cannot retroactively justify the continued detention on this post hoc basis.

■ Finally, the State contends that a warrant check on a passenger is proper as a routine and necessary part of a traffic stop, and the Appellant's continued detention was thus reasonable as within the scope of the original purpose of the stop. We disagree.[57] The State has not cited,

---

55. See Sims, 84 S.W.3d at 809–10 (when deputy initiated investigative detention, he did not know appellant had given him incorrect spelling of his name; thus, officer's further detention could not be based on reasonable suspicion of violation of failure-to-identify statute); cf. Farmer v. State, 47 S.W.3d 187, 190–91 (Tex.App.-Texarkana 2001, pet. ref'd) (holding whether passenger was "lawfully detained" as witness to traffic violation when officer asked his name so that his false identification violated failure-to-identify statute not necessary to decide since other articulable facts justified continued detention).

56. See People v. Miles, 343 Ill.App.3d 1026, 278 Ill.Dec. 522, 798 N.E.2d 1279, 1285 (2003) (refusing to fill gap in evidence by taking judicial notice of meaning of absence of record of license when officers provided no explanation as to why result of license check of "no record on file" was inherently suspicious).

57. See Delaware v. Prouse, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979) (holding random traffic stops for license and registration checks are contrary to Fourth Amendment).

nor have we found, a case holding that warrant checks on passengers, as compared with such checks on drivers, are a routine component of traffic stops.[58] Moreover, the State here concedes that the purpose of the stop for a non-functioning license plate light was complete before the officers continued their questioning of Appellant to demand his identity. But as we have previously noted, a warrant check cannot be used solely as a means to prolong a detention, "once the reasonable suspicion forming the basis for the stop has been dispelled." [59]

◼ Alternatively, the State argues that the officers' purpose for stopping the vehicle in this particular case included a warrant check on Appellant. While we might speculate that the officers had some unarticulated knowledge that he might have outstanding warrants, nothing in the record supports articulable facts establishing reasonable suspicion that he was a fugitive.[60]

The State never established articulable facts arising during the initial traffic stop to support a reasonable suspicion to justify the deputies' continued detention and investigation of Appellant for nearly ten additional minutes—double the time of the initial traffic stop. Considering the totality of the circumstances from an objective standpoint, Appellant's continued detention was a classic "fishing expedition," based on a hunch. Accordingly, we hold that the prolonged duration of the detention of Appellant was illegal in violation of the Fourth Amendment.

◼ Appellant contends that his false statements as to his identity and the marijuana discovered in the search incident to his arrest on the outstanding warrants were obtained as the result of the illegal detention and demands for his identification. Thus, he argues that the evidence should be suppressed as obtained in violation of the Fourth Amendment under the "fruits of the poisonous tree" doctrine.[61] In determining whether evidence was the fruit of Appellant's illegal detention and questioning, the critical issue is whether the evidence was gained by the exploitation of that illegality.[62]

---

58. *See Kothe,* 152 S.W.3d at 64 (noting that license and warrant check on *driver* is generally viewed as reasonable law enforcement exercise and an "additional component" of a routine traffic stop). *But see State v. Page,* 140 Idaho 841, 103 P.3d 454, 460 (2004) (holding encounter became improper detention when officer took passenger's license back to police car to run warrant check); *see generally* 4 LaFave, *supra* note 35, § 9.3(d), at 388–89 & n. 158 (stating, "it is to be doubted whether there is any valid reason for automatic warrant checks on mere passengers").

59. *Kothe,* 152 S.W.3d at 64; *see Tucker v. State,* 183 S.W.3d 501, 509 (Tex.App.-Fort Worth 2005, no pet.) (holding officers had reasonable suspicion to identify passengers and check for outstanding warrants after traffic stop when the officers previously had been notified that car contained named felony parole violator); *Petty v. State,* 696 S.W.2d 635, 638 (Tex.App.-Dallas 1985, no pet.) (holding warrant check not unreasonable where detention not extended solely for that purpose); *see also People v. McGaughran,* 25 Cal.3d 577, 159 Cal.Rptr. 191, 601 P.2d 207, 212 (1979) (noting warrant check permissible if stop not extended solely for that purpose); *Jackson,* 39 P.3d at 1190 (holding detention of passenger for warrant check violated Fourth Amendment absent reasonable suspicion).

60. *But see Tucker,* 183 S.W.3d at 509 (holding officers' information that described vehicle, including license number, contained parole violator constituted reasonable suspicion to check for warrants).

61. *See Wong Sun v. United States,* 371 U.S. 471, 484–85, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963); *see also* Tex.Code Crim. Proc. Ann. art. 38.23(a) (Vernon 2005).

62. *Neese v. State,* 930 S.W.2d 792, 801 (Tex. App.-Beaumont 1996, pet. ref'd) (citing *Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417).

824

■ Appellant's first false identification was not made while he was "lawfully detained" in violation of the failure to identify statute, since the deputies' initial request for his identity at the outset of the traffic stop constituted only a consensual encounter, not an investigative detention.[63]

■ But Appellant's false statements as to his identity made as the result of police questioning at the later time when he was illegally detained are clearly causally connected to and the result of the illegal investigative detention following the termination of the reason for the traffic stop. This evidence was directly obtained in violation of the Fourth Amendment. Accordingly, those false statements made by Appellant should have been suppressed.[64] Therefore, the trial court erred in denying Appellant's motion to suppress the evidence of those false statements.

■ The contraband discovered in Appellant's possession was obtained in the search incident to his arrest on the outstanding warrants discovered by the deputies only after obtaining his correct name and birth date through their continued questioning during the prolonged deten-

tion. Generally, evidence obtained as a direct result of illegal police conduct, be it illegal arrest or illegal search, is suppressed either by cases providing the remedy of exclusion of such evidence for violations of the Fourth Amendment and/or Article 1, section 9 of the Texas Constitution, or by statutory provisions such as code of criminal procedure article 38.23.[65]

■ The primary purpose of the exclusionary rule and of article 38.23 is to deter unlawful police conduct by precluding the use against the accused of evidence obtained by illegal police activity.[66] The federal exclusionary rule and article 38.23 extend not only to evidence obtained as a direct result of an illegal arrest, search, or seizure, but also to evidence obtained as an indirect result of an illegal arrest, search, or seizure, known as the "fruit of the poisonous tree."[67]

■ On the other hand, both the federal and state exclusionary rules allow the admission of otherwise tainted evidence if the connection between the initial illegality and the discovery of the challenged evidence has become so attenuated as to dissipate the taint of the prior illegality.[68] But the prosecution bears the bur-

63. See Quick v. State, 999 S.W.2d 79, 80–81 (Tex.App.-Houston [14th Dist.] 1999, no pet.) (holding that because appellant was not under arrest or detained at time he gave officer a false name, the evidence was legally insufficient to support his conviction for failure to identify).

64. See Domingo v. State, 82 S.W.3d 617, 622 (Tex.App.-Amarillo 2002, no pet.) (holding that appellant was not lawfully detained for investigation of public intoxication when he gave false identification; therefore, trial court erred in denying his motion to suppress his false identification statements).

65. See Boyd v. United States, 116 U.S. 616, 638, 6 S.Ct. 524, 538, 29 L.Ed. 746 (1886); Bell v. State, 724 S.W.2d 780, 787 (Tex.Crim. App.1986), cert. denied, 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987); see also United States v. Calandra, 414 U.S. 338, 347–

48, 94 S.Ct. 613, 619–20, 38 L.Ed.2d 561 (1974).

66. Article 38.23(a) provides,
No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.
Tex.Code Crim. Proc. Ann. art. 38.23(a); Calandra, 414 U.S. at 347, 94 S.Ct. at 619–20.

67. See Wong Sun, 371 U.S. at 484, 83 S.Ct. at 416; Smith v. State, 542 S.W.2d 420, 422 (Tex.Crim.App.1976); State v. Mayorga, 876 S.W.2d 176, 177 (Tex.App.-Dallas 1994), aff'd and remanded, 901 S.W.2d 943 (Tex.Crim. App.1995).

68. See Wong Sun, 371 U.S. at 487, 83 S.Ct. at 417; Johnson v. State, 871 S.W.2d 744, 750

den of showing that unlawfully obtained evidence is admissible under an exception to the federal exclusionary rule.[69] The prosecution also has the burden under article 38.23 to show the applicability of the attenuation doctrine to the challenged evidence.[70] The State has not contended that the attenuation doctrine should apply in this case, and we do not address it further. Additionally, courts have cautioned against allowing evidence to be admitted that has been obtained in a manner that would undermine the policies of deterrence and integrity of the courts.[71] We are admonished by the Supreme Court in *Terry* that we, as the judiciary, are responsible to "guard against police conduct which is over-bearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires."[72] We sustain Appellant's two points.

## CONCLUSION

We hold that the trial court erred by denying Appellant's motions to suppress his statements and the marijuana. Therefore, we reverse Appellant's conviction for the offense of possession of marijuana as well as the conviction for failure to identify and remand those causes to the trial court for proceedings not inconsistent with this opinion.

CAYCE, C.J.; HOLMAN and McCOY, JJ., dissent without opinion.

---

(Tex.Crim.App.1994) (holding attenuation analysis applicable under article 38.23 as a method of determining whether evidence was "obtained" in violation of law).

**69.** *See Brown v. Illinois,* 422 U.S. 590, 604–05, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975); *see also Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984) (burden of proof on prosecution to show exception to exclusionary rule by preponderance of evidence).

**70.** *See Brown,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62; *Gordon v. State,* 801 S.W.2d 899, 913 n. 14 (Tex.Crim.App.1990).

**71.** As to application of the attenuation doctrine where evidence was obtained by search incident to a legal arrest pursuant to outstanding warrants discovered during an illegal detention, see *Fletcher v. State,* 90 S.W.3d 419, 421 (Tex.App.-Amarillo 2002, no pet.) ("[O]ur decision should not be read as implying that an officer may detain individuals for no other reason than his hope to later discover that they are subject to arrest via a pre-existing, valid warrant."). *See also McBath v. State,* 108 P.3d 241, 249 (Alaska Ct.App.2005) (noting even where evidence clearly obtained via valid outstanding warrant, flagrance of police misconduct may still require exclusion "as, for example, where the police conducted an unjustifiable 'dragnet' investigative stop of many people, hoping to find some for whom there were outstanding arrest warrants"); *State v. Bigham,* 141 Idaho 732, 117 P.3d 146, 149 (Idaho Ct.App.2005) (holding taint from illegal detention attenuated by discovery of outstanding warrant where there was no evidence officer stopped appellant solely to request identity in order to run warrant check).

**72.** *Terry,* 392 U.S. at 15, 88 S.Ct. at 1876.