

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-13-00207-CR

Roel **CANTU**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 81st Judicial District Court, Atascosa County, Texas
Trial Court No. 11-11-0261-CRA
Honorable Stella Saxon, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:    Karen Angelini, Justice
Sandee Bryan Marion, Justice
Patricia O. Alvarez, Justice

Delivered and Filed:  August 27, 2014

AFFIRMED

A jury convicted Roel Cantu of possession of marijuana in an amount of 2,000 pounds or less but more than 50 pounds. On appeal, Cantu challenges the trial court's denial of his motion to suppress evidence, arguing (1) any evidence obtained in a vehicle search should have been suppressed because the detention of the vehicle was not supported by reasonable suspicion of criminal activity beyond the initial traffic violation; (2) consent to search the vehicle was invalid because it was not free and voluntary; and (3) he has standing to object to the search of the vehicle

because his constitutional rights were violated by the illegal detention of the vehicle and the search of his person. We affirm.

## STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress for an abuse of discretion. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). "We view the record in the light most favorable to the trial court's conclusion and reverse the judgment only if it is outside the zone of reasonable disagreement." *Id*. "We give almost total deference to the trial court's express or implied determination of historical facts and review *de novo* the court's application of the law of search and seizure to those facts." *Id*.

Generally, we limit our review to the evidence adduced at the suppression hearing; however, when, as here, the suppression issues are re-litigated at the trial on the merits, we consider the evidence from both the pretrial hearing and the trial on the merits in reviewing the trial court's suppression ruling. *See Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996); *Arizpe v. State*, 308 S.W.3d 89, 91 (Tex. App.—San Antonio 2010, no pet.).

## THE EVIDENCE

Cody Wallace, a Texas Department of Public Safety officer was the primary witness to testify at the suppression hearing and at trial.[1] According to Wallace, Cantu was a passenger in a pickup truck that he stopped on June 8, 2011, at 6:20 p.m., a Wednesday evening. The truck was heading northbound on Interstate Highway 37 in Atascosa County, Texas. Wallace directed the truck's driver, who was later identified as Christina Naranjo, to exit the truck and come behind the truck to talk to him. Wallace explained to Naranjo that he had stopped her because the truck had

---

[1] The stop and subsequent detention were recorded by a video camera that was attached to Wallace's patrol car. This video recording was admitted into evidence.

veered onto the improved shoulder three times, which was prohibited under the circumstances. In response, Naranjo explained that the truck's steering was hard and that she planned to stop soon to buy some power steering fluid. Naranjo handed Wallace her driver's license. Wallace noticed that Naranjo's hand was shaking uncontrollably, which he considered to be a sign of extreme nervousness. Naranjo then walked over to the passenger side of the truck and obtained proof of insurance from a man who was sitting in the passenger seat. The man was later identified as Cantu. When Naranjo returned, Wallace informed Naranjo that she was going to be given a warning for the traffic violation. At this point, Wallace noticed that Naranjo's cheeks were also shaking uncontrollably. Wallace considered this to be another sign of extreme nervousness. Wallace found Naranjo's extreme nervousness to be unusual. In Wallace's experience, most drivers are relieved to learn they are getting only a warning.

Wallace also recognized Naranjo from a traffic stop that had occurred about two months earlier near Alice, Texas. Wallace had not initiated the prior stop; he had appeared at the scene to assist another trooper. Wallace noticed that the truck Naranjo was currently driving was the same type of truck that had been involved in the prior stop. The prior stop had resulted in the seizure of approximately fifty pounds of marijuana, which was hidden in the truck. In the previous case, Naranjo was a passenger and the driver of the truck was a man.

Wallace questioned Naranjo about her trip and the truck's ownership. Naranjo stated that she and Cantu were cousins and they were traveling from Rio Grande City to Austin to visit their uncle, who was sick. She explained that her uncle had been in hospice, but then his health improved so he was moved back home where he was more comfortable. The truck belonged to her uncle and she was taking it to him because he needed transportation. Naranjo stated that her uncle's name was "Vicente Cantu." Naranjo explained that she and Cantu would be returning to Rio Grande City by bus in a few days.

Wallace then walked over to Cantu, who remained seated in the truck. Wallace asked Cantu if he had any identification on him, and Cantu produced an identification card. Wallace noticed that Cantu's leg was shaking uncontrollably. Wallace asked Cantu to exit the truck, and Cantu complied. Standing near the front of the truck, Wallace asked Cantu about the purpose of his trip, his destination, and his occupation. Cantu said he had worked on an oil rig in Zapata, but he was now unemployed and indicated it was because of the economy. Cantu also said that he currently had a landscaping business in Rio Grande City. When Wallace asked Cantu who the truck belonged to, Cantu hesitated, then said it belonged to his uncle, "Theodore Cantu." Cantu's responses raised Wallace's suspicions for several reasons. First, the oil industry was currently booming in South Texas. Second, the first name Cantu provided for his uncle and the owner of the truck was different from the first name provided by Naranjo.

Furthermore, Wallace noticed that when Naranjo and Cantu spoke, and in particular when providing details, they failed to maintain eye contact with him. Based on Naranjo's and Cantu's conduct and their answers to his questions, Wallace felt the need to investigate possible criminal activity. At this juncture, Wallace was the only officer present. Wallace asked Cantu if he had any weapons on him and Cantu denied that he did. When Wallace asked Cantu if he could conduct a pat down search to ensure that Cantu had no weapons, Cantu stated that he could. In conducting the pat down search of Cantu, Wallace found no weapons, but when he momentarily placed his hand over Cantu's heart he could tell it was beating very fast. Wallace considered this to be another sign of extreme nervousness. Wallace also felt a small bulge in Cantu's rear pant pocket. Wallace asked Cantu what was in his pocket, and Cantu pulled out a small statue of Santa Muerte. Before Wallace asked any questions about the statue, Cantu told Wallace that he had found the statue at a gas station. Wallace testified that during his criminal interdiction training he learned that some people involved in the drug trade carry Santa Muerte items with them while transporting drugs

because they believe it will protect them and their drug loads. Wallace considered the presence of the Santa Muerte statue to be another indicator that criminal activity was taking place.

Once again, Wallace told Naranjo that she was going to get a warning. Wallace returned to his vehicle to start typing out the warning. While typing out the warning, Wallace asked Naranjo if she had anything illegal in the truck, to which Naranjo answered, "No, sir. You can go ahead and check." Wallace asked Naranjo if she was giving him permission to search the truck, to which she responded, "Sure." Wallace then conducted a search of the truck. A second trooper appeared on the scene at the beginning of the search.

During the search, Wallace looked inside the truck cab and noticed that the seat bolts had fresh gray paint on them. Wallace explained that seat bolts are often painted by drug traffickers to cover up tool marks. After Wallace saw the freshly-painted bolts, he placed a hand under the seat and a hand on top of the seat and felt a bundle inside of the seat. Wallace found a total of ten bundles of marijuana hidden inside of the truck's seat. Wallace and the other trooper arrested Naranjo and Cantu for possession of marijuana.

At the conclusion of the suppression hearing, the trial court stated:

> [T]he stop was good because the driver drove on the []improved shoulder and did not [fall within any of the exceptions] . . . . So once the stop was good, then the questioning—first of all, the questioning of the driver and nervousness being detected there allowed a further continued investigation, and so on down the line, step by step, Trooper Wallace conducted his investigation and each time that there was continued—continuation of the stop, he was gathering additional information which gave him reasonable suspicion. And so, under the totality of the circumstances, the time in which the defendant and the driver were kept by the side of the road before the consent was given was a reasonable amount of time. The consent that was given was unequivocal and the search was good.

The trial court also stated that Cantu had no standing to challenge the search of the truck because he was not the owner or the driver of the truck, and he had no possessory interest in the truck. The trial court then denied Cantu's motion to suppress.

**EXISTENCE OF REASONABLE SUSPICION**

Cantu's primary argument on appeal is that any evidence obtained in the search of the truck should have been suppressed because the continued detention of the truck was not supported by reasonable suspicion of criminal activity beyond the initial traffic violation. To support his argument, Cantu cites both the federal and state constitutions. Cantu does not challenge the lawfulness of the initial stop.

The Fourth Amendment of the U.S. Constitution and Article I, Section 9 of the Texas Constitution protect individuals against unreasonable searches and seizures. *State v. Betts*, 397 S.W.3d 198, 203 (Tex. Crim. App. 2013). A traffic stop is reasonable if the police officer was justified in making the stop and his actions during the stop were limited in length and scope to those necessary to fulfill the purpose of the stop. *Kothe v. State*, 152 S.W.3d 54, 63 (Tex. Crim. App. 2004); *Davis v. State*, 947 S.W.2d 243, 245 (Tex. Crim. App. 1997). During the stop, an officer may request identification, proof of insurance, and vehicle registration; check on outstanding warrants; verify that the vehicle is not stolen; and ask about the purpose of the trip and the intended destination. *Kothe*, 152 S.W.3d at 63; *Estrada v. State*, 30 S.W.3d 599, 603 (Tex. App.—Austin 2000, pet. ref'd); *Ortiz v. State*, 930 S.W.2d 849, 856 (Tex. App.—Tyler 1996, no pet.). The officer may seek this information from not only from the driver, but also from any passengers. *Kothe*, 152 S.W.3d at 64 n.36; *St. George v. State*, 197 S.W.3d 806, 817-18 (Tex. App.—Fort Worth 2006), *aff'd*, 237 S.W.3d 720 (Tex. Crim. App. 2007); *Freeman v. State*, 62 S.W.3d 883, 888 (Tex. App.—Texarkana 2001, pet. ref'd). Although no rigid time limitation exists on its duration, a traffic stop may last no longer than is necessary to effectuate its purpose. *Kothe*, 152 S.W.3d at 63-65 n.43. When the reason for the traffic stop has been satisfied, the stop may not be used as a "fishing expedition" for unrelated criminal activity. *Davis*, 947 S.W.2d at 243; *Parker v. State*, 297 S.W.3d 803, 810 (Tex. App.—Eastland 2009, pet. ref'd). "But if reasonable suspicion

of additional criminal activity arises in the course of a stop and before the purpose of the stop is fulfilled, then a continued detention may be justified until the new suspicion has been confirmed or dispelled." *St. George*, 197 S.W.3d at 817.

Reasonable suspicion exists if the officer has specific, articulable facts which, premised upon the officer's experience and personal knowledge, and coupled with rational inferences from those facts, reasonably warrant the intrusion caused by the continued detention. *Davis*, 947 S.W.2d at 244; *Parker*, 297 S.W.3d at 810. The articulable facts must amount to more than a mere hunch or suspicion. *Davis*, 947 S.W.2d at 244. The articulable facts must create some reasonable suspicion that some activity out of the ordinary is occurring or has occurred, some suggestion to connect the detainee with the unusual activity, and some indication that the unusual activity is related to crime. *Id.*

The determination of reasonable suspicion is "based on commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). The standard is an objective one that disregards the actual subjective intent of the officer and looks to whether there was an objectively justifiable basis for the detention. *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011). "It also looks to the totality of the circumstances; those circumstances may all seem innocent enough in isolation, but if they combine to reasonably suggest the imminence of criminal conduct, an investigative detention is justified." *Id.*

Cantu argues that Wallace did not have reasonable suspicion to justify the continued detention of the truck. Cantu maintains that the continued detention of the truck was based solely on Wallace's inarticulate hunch that Naranjo and Cantu were involved in criminal activity. According to Cantu, Wallace observed no more than signs of nervousness. However, the evidence shows otherwise. Although Wallace testified that he observed signs of extreme nervousness in both Naranjo and Cantu, he also testified about other observations he made and he placed these

observations in the context of his training and experience. "Although nervousness alone is not sufficient to establish reasonable suspicion for an investigative detention, it can do so in combination with other factors." *Hamal v. State*, 390 S.W.3d 302, 308 (Tex. Crim. App. 2012).

Here, Wallace testified that he recognized Naranjo from a traffic stop that occurred two months ago. During the prior traffic stop, marijuana was found hidden in a truck. The truck Naranjo was driving was the same type of truck used in the previous case. Naranjo and Cantu each provided a different first name for their uncle, and they both claimed that their uncle was the owner of the truck.[2] Given the current status of the oil industry in South Texas, Wallace disbelieved Cantu's claim that he lost his job because of the economy. And, according to Wallace, Naranjo's and Cantu's statements that they planned to leave the truck in Austin and to return home on a bus was consistent with illegal trafficking. Finally, Cantu was carrying a statue of Santa Muerte. Wallace learned in his criminal interdiction training that people involved in the drug trade sometimes carry such an item with them because they believe it will protect them and their drug loads. In light of this combination of factors, we conclude that Wallace had reasonable suspicion to continue to detain the truck and its occupants.

In conjunction with his argument about a lack of reasonable suspicion, Cantu complains that the pat down search of his person was unreasonable. We disagree. A valid investigative detention can confer upon an officer the authority to pat down the suspect for weapons. *Baldwin v. State*, 278 S.W.3d 367, 371 (Tex. Crim. App. 2009). A law enforcement officer may conduct a limited search for weapons of the suspect's outer clothing, even in the absence of probable cause, when the officer reasonably believes that the suspect is armed and dangerous. *Balentine v. State*,

---

[2]Wallace also testified that before initiating the stop, he ran a computer check of the truck's license plate number. The computer check showed that the truck was not stolen; however, it also showed the truck's owner was neither a Vicente nor a Theodore Cantu.

71 S.W.3d 763, 769 (Tex. Crim. App. 2002). The officer need not be absolutely certain that an individual is armed; the question is whether a reasonably prudent person would believe that he or others were in danger. *Id*. The Texas Court of Criminal Appeals has recognized that roadside encounters are especially hazardous for law enforcement. *Carmouche v. State*, 10 S.W.3d 323, 330 (Tex. Crim. App. 2000). The Court has further acknowledged that an officer's reasonable belief that a suspect is armed and dangerous may be predicated on the nature of the suspected criminal activity, and that weapons and violence are frequently associated with drug transactions. *Id*. Furthermore, consent to search is a well-established exception to the requirements of both a warrant and probable cause. *Id*. at 331.

We first note that the evidence showed that Wallace asked for and was given consent to conduct the pat down search. In addition to this consent, Wallace testified that his experience has taught him that drug traffickers are often armed and dangerous. Wallace also observed extreme nervousness in Naranjo and Cantu, and recognized Naranjo from a prior traffic stop in which marijuana was found hidden in a truck. Moreover, at the time Cantu's pat down search took place, Wallace was the only officer present. Under these circumstances, Cantu's pat down search was reasonable.

Because the continued detention was supported by reasonable suspicion of criminal activity beyond the initial traffic violation, and because Cantu's pat down search was reasonable under the circumstances, the trial court properly denied Cantu's motion to suppress.

### REMAINING ARGUMENTS

Cantu argues that the search of the truck was unlawful because Naranjo's consent to search the truck was not freely and voluntarily given. Cantu further argues that he has standing to object to the search of the truck because his own constitutional rights were violated by his continued detention and the pat down search of his person.

To establish standing to contest a search, a defendant must show he had a legitimate expectation of privacy in the area searched. *Trinh v. State*, 974 S.W.2d 872, 874 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (citing *Metoyer v. State*, 860 S.W.2d 673, 677 (Tex. App.—Fort Worth 1993, pet. ref'd)). Generally, a mere passenger in a vehicle does not have a legitimate expectation of privacy in a vehicle when he fails to assert a possessory interest in the vehicle or the property seized. *Id*. (citing *Meeks v. State*, 692 S.W.2d 504, 510 (Tex. Crim. App. 1985)). However, a mere passenger may challenge the search of a vehicle if the search resulted from a violation of his own constitutional rights. *Lewis v. State*, 664 S.W.2d 345, 348 (Tex. Crim. App. 1984); *id*.; *see also Betts*, 397 S.W.3d at 203 (noting that the rights secured by the Fourth Amendment of U.S. Constitution and Article I, Section 9 of the Texas Constitution are personal).

As previously discussed, Cantu's constitutional rights were not violated by the continued detention or the pat down search. Thus, the search of the truck in no way resulted from a violation of Cantu's constitutional rights. Moreover, Cantu does not assert a possessory interest in the truck or the property seized. Therefore, Cantu lacks standing to challenge the search of the truck. *See Meeks*, 692 S.W.2d at 510 (holding that, even when the driver's consent to search the vehicle was involuntary, a passenger who failed to assert a possessory interest in the vehicle or the property seized lacked standing to challenge the search of the vehicle).

#### CONCLUSION

The trial court's judgment is affirmed.

Karen Angelini, Justice

Do not publish