

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-10-00027-CR

KELLI NOEL TORRENCE                                    APPELLANT

V.

THE STATE OF TEXAS                                        STATE

----------

### FROM THE 396TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. Introduction

Appellant Kelli Noel Torrence pleaded guilty to possession with intent to deliver more than four but less than two hundred grams of methamphetamine and was given six years' deferred adjudication. *See* Tex. Health & Safety Code Ann. §§ 481.102(6), .112(a), (d) (West 2010). In a sole point, she contends that the trial court erred by denying her motion to suppress the evidence obtained as

---

[1]*See* Tex. R. App. P. 47.4.

a result of an allegedly illegal detention, which she argues was unnecessarily prolonged to conduct a canine sniff. We affirm.

## II. Background

Investigator Doug Deweese is a narcotics investigator with the Tarrant County District Attorney's office with more than twelve years' experience in narcotics investigations. On October 1, 2007, Investigator Deweese was investigating narcotics leads in the White Settlement area of Fort Worth with his field supervisor Sergeant Peabody. As Investigator Deweese waited outside a convenience store while Sergeant Peabody got a drink, he saw a 1998 Dodge Durango with license plate number 930JMJ that a confidential informant had previously described to him as the vehicle Appellant used to deal "ice" or methamphetamine. The informant had said that Appellant "was dealing in narcotics and that she would many times carry narcotics in the Durango with her." After receiving this information, Investigator Deweese pulled Appellant's driver's license number from Tarrant County Jail booking records, accessed her driver's license photograph through DPS records, and confirmed that the Dodge Durango was registered to her.

Investigator Deweese and Sergeant Peabody remained in their vehicle and watched as the Dodge Durango and another vehicle pulled close together in a Waffle House parking lot and stopped "driver's door to driver's door." There was only one person in each vehicle, the vehicles were close enough for the drivers to reach one another, and it looked to Investigator Deweese as if the two drivers

"might have shook hands or possibly made a drug transaction."[2]  After about five minutes, the vehicles drove away in separate directions.  Although Investigator Deweese could not recall the make of the second vehicle, he identified Appellant in open court as the driver of the Dodge Durango.

Because he suspected criminal activity while watching the transaction between Appellant and the second driver, Investigator Deweese called the Fort Worth Police Department to determine if a patrol unit was available to make a traffic stop.  Fort Worth Police Department Officer A.R. White called Investigator Deweese by mobile telephone, and Investigator Deweese provided Officer White with information about Appellant's vehicle, location, and direction of travel and what had transpired in the Waffle House parking lot.  Investigator Deweese also informed Officer White that he would need his own probable cause—beyond the information provided to him—before making the traffic stop.

Officer White located Appellant's Dodge Durango and followed it until he observed two traffic violations.  He initiated a traffic stop, and upon approaching the vehicle, he noticed Appellant "reaching and making furtive movements in the vehicle towards the center console and underneath the seat as if she were reaching for or concealing something."  He asked Appellant to step out of the

---

[2]Investigator Deweese later clarified that although he did not actually see any money or other items exchanged between the drivers and had not used binoculars, "[i]t appeared to [him] as though they had made – either shaken hands or made a drug transaction" and that he believed it to be a drug transaction based on his many years of experience in conducting surveillance and seeing similar activity.

vehicle because he knew of Investigator Deweese's suspicion of drug activity and thought Appellant might be reaching for a weapon or attempting to destroy evidence. Officer White also noticed that Appellant was "extremely nervous and trembling." He asked her routine questions about insurance and her driver's license but said that "[s]he was fumbling around, extremely nervous, more nervous than the average person is on a traffic stop." Officer White also thought Appellant was hesitant in answering his questions, and he observed her "visibly trembling" as he spoke with her. Another officer conducted a pat-down search of Appellant but did not find any weapons.

Officer White returned to his car to check on Appellant's license and registration, and he also contacted Investigator Deweese by telephone, informing Investigator Deweese that Appellant denied consent to search or having anything illegal in the vehicle.[3] Meanwhile, Investigator Deweese and Sergeant Peabody had driven to a nearby location to watch the traffic stop and assist Officer White if needed. While they waited, Investigator Deweese contacted the sheriff's office and requested a unit for a canine sniff of Appellant's vehicle. After Officer White had called Investigator Deweese, Investigator Deweese approached Officer White and informed him that he had requested the canine unit, and Officer White informed Investigator Deweese of his observations during the traffic stop and

---

[3]Investigator Deweese similarly testified that Officer White had called him and had said Appellant was "very nervous acting," was fidgety, and had refused consent to a search of the Dodge Durango.

gave Investigator Deweese Appellant's driver's license. Officer White then stood by to assist Investigator Deweese.

Investigator Deweese approached Appellant and observed that she appeared nervous. She answered Investigator Deweese's questions, but she was fidgety and sweating profusely even though it was October. By contrast, Officer White was not sweating despite wearing a bullet-proof vest and a dark uniform. Investigator Deweese advised Appellant of his suspicion and what he had seen, and he told her that a canine unit was en route but that it could be forty-five minutes before the unit arrived. Investigator Deweese told Appellant that she was free to leave but that he was going to detain her vehicle until the unit arrived. Appellant elected to remain with her vehicle.

The unit arrived about twenty-five minutes later, and the canine alerted on the rear passenger area of Appellant's vehicle. Inside the Dodge Durango, Investigator Deweese found a plastic container with a green leafy substance he recognized to be marijuana and a yellow, plastic bowl containing a crystal substance that later tested positive for methamphetamine.

Investigator Deweese testified that the area around the Waffle House, where he had observed Appellant engage in a possible drug transaction, is a "very high crime area" with a lot of drug traffic and criminal activity. He based his opinion on his experience of executing search warrants in the area and information from the Fort Worth Police Department that they "saturate" the area with patrol units because of the criminal activity. On cross-examination,

Investigator Deweese clarified that he believes the high-crime area near the Waffle House includes the geographic area "within a mile or so" of the Waffle House.

Investigator Deweese testified that he believed the information from the confidential informant to be credible and reliable based on his experience with the informant. Investigator Deweese had received information from the informant on two or three different occasions when the informant had observed Appellant in possession of methamphetamine, and the informant had last seen Appellant with methamphetamine "a week or so" earlier. However, Investigator Deweese could not recall the date he acquired the information from the informant about Appellant and said he received the information about Appellant either in person or by telephone within a month of Appellant's arrest. Further, although Investigator Deweese testified that the informant had given him information that he had successfully used on more than one occasion, he acknowledged that his affidavit in this case only mentioned one prior felony arrest and that he could not remember the date of the prior arrest. Investigator Deweese clarified, though, that the affidavit does not mention other times he had obtained accurate information from the informant and that he does not arrest every person he investigates, even if he finds them in possession of drugs.

### III. Discussion

Appellant does not challenge the traffic stop by Officer White but contends there was no reasonable suspicion to detain her vehicle for a canine sniff after

the traffic stop had concluded.  The State responds that Appellant failed to preserve her complaint for appeal and alternatively contends that police had reasonable suspicion to detain Appellant's vehicle to continue their investigation.

## A.  Preservation of Error

As a threshold matter, we address the State's argument that Appellant failed to preserve her complaint for appeal.  To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion.  Tex. R. App. P. 33.1(a)(1); *Layton v. State*, 280 S.W.3d 235, 238–39 (Tex. Crim. App. 2009).  The error alleged on appeal must correspond to the objection made at trial.  *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002).  Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule.  Tex. R. App. P. 33.1(a)(2); *Mendez v. State*, 138 S.W.3d 334, 341 (Tex. Crim. App. 2004).  A reviewing court should not address the merits of an issue that has not been preserved for appeal.  *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009).

"A motion to suppress is a specialized objection to the admissibility of evidence," and it must meet the same requirements as an objection.  *Id.*  The two purposes of the specificity requirement are "to inform the trial judge of the basis for the objection" and provide "opposing counsel the opportunity to cure the

objection or supply other testimony." *Zillender v. State*, 557 S.W.2d 515, 517 (Tex. Crim. App. 1977) (op. on reh'g).   Here, the motion to suppress was timely, and the trial court denied the motion.   The issue is therefore whether the complaint was sufficiently specific.   Rule of appellate procedure 33.1(a)(1)(A) requires that a complaint be made "with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." Tex. R. App. P. 33.1(a)(1)(A).

Appellant filed two motions to suppress.   The second motion specifically stated that the trial court must "determine whether the canine sniff of [Appellant's] vehicle was, in fact, based on a reasonable suspicion that criminal activity was afoot."   It also argued that "only if the sum of the information known by the officers on the scene was sufficient to provide a reasonable suspicion that narcotics were in [Appellant]'s vehicle could the continued detention in order to conduct a dog sniff be considered reasonable."   Moreover, the second motion stated that "the information allegedly received from the confidential informant does not lend itself to a finding of reasonable suspicion."[4]   Finally, when the trial court asked Appellant's attorney at the suppression hearing "where the [d]efense is coming from on the suppression issue," Appellant's attorney specifically mentioned the transaction at the Waffle House being consistent with innocent

---

[4]The State characterizes Appellant's second motion to suppress as only challenging the warrant for her arrest, but the State ignores the express statements quoted above that challenge reasonable suspicion to justify her continued detention for a canine sniff.

conduct, the allegedly weak evidence that the transaction occurred in a high crime area, the lack of information concerning the informant's reliability, and Appellant's alleged nervousness, and he said that each of these was not a basis for a warrantless search. Appellant's attorney also stated that the issues for the court are "prior to the start of the canine" sniff. Appellant's complaints on appeal are exactly those expressly set forth in her second motion to suppress, which was denied by the trial court. We do not agree with the State's contention that Appellant failed to sufficiently complain to the trial court that her detention was prolonged for a canine sniff without reasonable suspicion. We therefore hold that Appellant preserved her complaint for appellate review. *See* Tex. R. App. P. 33.1(a) (requiring the complaining party to present to the trial court a timely request, objection, *or motion* that states the specific grounds for the desired ruling); *Wilson*, 71 S.W.3d at 349 (stating that "the point of error on appeal must comport with the objection made at trial").

## B. Reasonable Suspicion

Appellant, challenging the information provided by the confidential informant and the other information known to the officers on the scene, contends that there was no reasonable suspicion to detain her vehicle for a canine sniff once the initial traffic stop had concluded.

### 1. Standard of Review

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review, giving "almost total deference" to the trial court's findings of

historical fact supported by the record and reviewing de novo the trial court's application of the law to the facts that do not depend upon credibility and demeanor. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007). When the trial court fails to make explicit findings of fact, we "review the evidence in a light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact supported by the record." *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005); *see Weide v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007).

### 2. Applicable Law

The Fourth Amendment protects against unreasonable searches and seizures by government actors. *Weide*, 214 S.W.3d at 24. Because this was a warrantless search, the search is presumptively unreasonable, and the State has the burden to rebut that presumption. *See Ford*, 158 S.W.3d at 492. A search or seizure must be reasonable both at its inception and in its scope. *Terry v. Ohio*, 392 U.S. 1, 25–26, 88 S. Ct. 1868, 1882 (1968). The scope is limited to effectuating the reason for the stop. *Id.* Continued detention is justified only by reasonable suspicion that another offense has been or is being committed. *Davis v. State*, 947 S.W.2d 240, 245 (Tex. Crim. App. 1997).

Reasonable suspicion requires specific articulable facts which, taken together with rational inferences from those facts, would lead an officer to reasonably conclude that the suspect is, has been, or soon will be engaged in criminal activity. *Ford*, 158 S.W.3d at 492–93. This is an objective standard that

disregards the officer's subjective intent and looks solely to whether there was an objective basis for the suspicion. *Id.* at 492. We do not separately evaluate and accept or reject the individual objective facts relied on to establish reasonable suspicion because doing so does not adequately consider the totality of the circumstances; indeed, piecemeal evaluation and rejection of individual factors is prohibited by the Supreme Court. *See United States v. Arvizu,* 534 U.S. 266, 274, 122 S. Ct. 744, 751 (2002); *United States v. Sokolow*, 490 U.S. 1, 9–10, 109 S. Ct. 1581, 1586–87 (1989). We also do not consider the subjective motivation of the officer, but we do consider the officer's training, knowledge, and experience. *Wiede*, 214 S.W.3d at 25. Further, "the cumulative information known to the cooperating officers at the time of the stop is to be considered in determining whether reasonable suspicion exists." *Derichsweiler v. State*, No. PD-0176-10, 2011 WL 255299, at *4 (Tex. Crim. App. Jan. 26, 2011) (quoting *Hoag v. State*, 728 S.W.2d 375, 380 (Tex. Crim. App. 1987)).

When making a determination of reasonable suspicion, "the relevant inquiry is not whether particular conduct is innocent or guilty but the degree of suspicion that attaches to particular types of noncriminal acts." *Sokolow*, 490 U.S. at 10, 109 S. Ct. at 1587 (quoting *Illinois v. Gates*, 462 U.S. 213, 243–44 n.13, 103 S. Ct. 2317, 2335 n.13 (1983)); *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997). "When used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular

person."  *Woods*, 956 S.W.2d at 37–38 (quoting *United States v. Cortez*, 449 U.S. 411, 419, 101 S. Ct. 690, 695–96 (1981)).

The detainee's behavior can be a factor in determining the existence of reasonable suspicion.  *Illinois v. Wardlow*, 528 U.S. 119, 124–25, 120 S. Ct. 673, 676 (2000).  Evidence of nervousness, furtive gestures, sudden movements, or flight alone may be innocent, but if these actions are combined with other factors, they can give rise to reasonable suspicion.  *Id.*; *Worthey v. State*, 805 S.W.2d 435, 438–39 (Tex. Crim. App. 1991).  Officers may rely on their training, knowledge, and law enforcement experience to reach their level of suspicion.  *Cortez*, 449 U.S. at 419, 101 S. Ct. at 695–96; *Weide*, 214 S.W.3d at 25.

In addition, a confidential informant can provide the requisite reasonable suspicion to justify an investigative detention provided additional facts are present to demonstrate the informant's reliability.  *See Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000).  "In situations involving the police's use of an informant, we consider the informant's reliability in analyzing the totality of the circumstances."  *Smith v. State*, 58 S.W.3d 784, 789 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) (citing *Cortez*, 449 U.S. at 417, 101 S. Ct. at 695; *Woods*, 956 S.W.2d at 38).  While an unverified tip may be insufficient to support arrest or a warrant, a tip by a known informant who has provided information in the past carries sufficient indicia of reliability to justify a stop.  *Adams v. Williams*, 407 U.S. 143, 146–47, 92 S. Ct. 1921, 1923–24 (1972).

### 3. Discussion

Although Appellant does not challenge the initial traffic stop, we note that it was reasonable because it was based on the patrol officer's observation of two traffic violations. *Crittenden v. State*, 899 S.W.2d 668, 674 (Tex. Crim. App. 1995). This is true even though the traffic stop was a pretext for pursuing further investigation of Appellant's narcotics activity. *Id.* at 671, 674; *Garcia v. State*, 827 S.W.2d 937, 944 (Tex. Crim. App. 1992). But before the officers could detain Appellant's vehicle for a canine sniff beyond the time required for the initial traffic stop, there must have been a reasonable suspicion that her vehicle contained narcotics. *See Crockett v. State*, 803 S.W.2d 308, 311 (Tex. Crim. App. 1991).

When Investigator Deweese informed Appellant that he was detaining her vehicle until a canine unit arrived for an olfactory sniff, the officers on the scene had several pieces of information.[5] First, a confidential informant had provided Investigator Deweese with Appellant's name, the make and model of her vehicle, and her vehicle's license plate number; the informant had seen Appellant with methamphetamine on two or three occasions, most recently about a week earlier and had said that Appellant often carried methamphetamine in the vehicle; and the informant had given accurate information on more than one occasion in the past, leading to at least one felony arrest. Investigator Deweese had confirmed

---

[5]According to the applicable standard of review and because the trial court did not make findings of fact, we set forth the facts here in the light most favorable to the trial court's ruling. *See Weide*, 214 S.W.3d at 25; *Ford*, 158 S.W.3d at 493.

that the Dodge Durango matching the informant's description was registered to Appellant, and he had accessed Appellant's driver's license photograph to confirm her identity. Moreover, Investigator Deweese had watched as Appellant and another person, in a high crime area, parked their vehicles "driver's door to driver's door" and either shook hands or exchanged something, and he believed this to have been a drug transaction based on his training and experience. Finally, the officers had observed that Appellant made furtive movements in the cab of her vehicle, was more nervous than the average person during a traffic stop, was visibly trembling and fidgety, was hesitant to answer Officer White's questions, and was sweating profusely on an October day.

This case is similar to two others in which our sister courts held there was reasonable suspicion to justify the detention. *See State v. 1998 Toyota Land Cruiser*, 277 S.W.3d 88 (Tex. App.—Amarillo 2009, no pet.); *Gonzales v. State*, No. 04-06-00259-CR, 2007 WL 1752130 (Tex. App.—San Antonio June 20, 2007, no pet.) (mem. op., not designated for publication). In *Gonzales*, an undercover officer received information concerning a large shipment of cocaine to the target of an ongoing narcotics investigation. 2007 WL 1752130, at *1. The officer began surveillance at the specified address and subsequently watched as Gonzales pulled into the driveway. *Id.* The suspected drug dealer exited the residence, entered the front passenger side of Gonzales's vehicle, appeared to have exchanged something with Gonzales, and returned to the residence. *Id.* Gonzales drove away but was soon stopped for failure to wear a seatbelt. *Id.*

While standing outside his vehicle as the traffic officer conducted a routine background check, Gonzales began acting nervously, pacing back and forth, and putting his hands in his coat pockets and inside his jacket. *Id.* The background check revealed that Gonzales had numerous narcotics offenses and was on probation. *Id.* at *2. At that point, the undercover officer requested a canine unit for a sweep of Gonzales's vehicle. *Id.* In total, Gonzales was detained for less than thirty minutes. *Id.* Based on these facts, the court held that the trial court did not err by determining that the officers had reasonable suspicion to believe Gonzales was involved in the ongoing criminal activity of drug trafficking. *Id.* at *4.

In *1998 Toyota Land Cruiser*, an officer was conducting surveillance for alcohol violations and other offenses when he saw a truck parked in a parking lot some distance from the nearby pizza parlor. 277 S.W.3d at 89–90. The officer then saw the appellant drive the Land Cruiser into the parking lot and park next to the truck. *Id.* at 90. The officer watched as the lone occupant of the truck entered the Land Cruiser and the appellant, still in the Land Cruiser, grabbed a back pack, retrieved items from it, and placed them on the center console. *Id.* Believing that he had observed a drug transaction, the officer called for backup, and the uniformed officers initiated contact with the appellant and the passenger in the Land Cruiser. *Id.* Holding that the officers had reasonable suspicion to temporarily detain the appellant and the passenger in the Land Cruiser, the court stated, "[T]o an officer charged with conducting surveillance in the area for

alcohol related and other offenses, [the observed circumstances] were reminiscent of those performed in a drug transaction. Given that, [the officers] had reasonable suspicion to believe criminal activity was afoot." *Id.* Similar to both *Gonzales* and *1998 Toyota Land Cruiser*, the officers in this case had information about Appellant's suspected narcotics activity, and they observed her engage in a suspected drug transaction, make furtive gestures, act nervously and visibly tremble and fidget, hesitantly answer Officer White's questions, and sweat profusely on an October day when Officer White was not sweating.

Appellant cites several cases to support her argument that there was no reasonable suspicion to continue her detention to permit the canine sniff, and in doing so, she separately challenges the information received from the confidential informant and most of the other facts known to the officers. For example, Appellant argues that the informant was not shown to be reliable and that the information from the informant could have been stale and was not independently corroborated by Investigator Deweese. *See Smith*, 58 S.W.3d at 789–93; *State v. Williams*, 812 S.W.2d 46 (Tex. App.—Corpus Christi 1991, no pet.). Appellant also points out that nervousness, sweating, furtive gestures, or presence in a high crime area are not enough, alone, to support reasonable suspicion. *See Davis*, 947 S.W.2d at 241; *Sieffert v. State*, 290 S.W.3d 478 (Tex. App.—Amarillo 2009, no pet.); *St. George v. State*, 197 S.W.3d 806 (Tex. App.—Fort Worth 2006), *aff'd*, 237 S.W.3d 720 (Tex. Crim. App. 2007); *Herrera v. State*, 80 S.W.3d 283 (Tex. App.—Texarkana 2002, pet. ref'd); *Klare v. State*, 76 S.W.3d

68 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd); *McQuarters v. State*, 58 S.W.3d 250 (Tex. App.—Fort Worth 2001, pet. ref'd).

Appellant's arguments are misplaced. First, Appellant's attempt to separate and individually challenge the individual pieces of information known to the officers at the time of the continued detention has been rejected by the Supreme Court. *See Arvizu,* 534 U.S. at 274, 122 S. Ct. at 751 (rejecting piecemeal evaluation and rejection of individual factors). Rather than separately analyzing and accepting or rejecting the objective facts known to the officers in conducting a reasonable suspicion analysis, we must view all of the objective facts in the aggregate as part of the totality of the circumstances. *See id.,* 122 S. Ct. at 751; *Ford*, 158 S.W.3d at 492–93. Moreover, each of Appellant's cases is distinguishable and does not adequately address the totality of the circumstances present in this case. For example, in *McQuarters*, the appellant was stopped for suspicion of DUI, but the officer quickly determined that the appellant was not intoxicated. *See* 58 S.W.3d at 253. And although the appellant appeared nervous, he and his passenger gave conflicting accounts of their recent trip to Dallas, the appellant's license had been revoked, and the vehicle he drove was rented but not to him or his passenger, the appellant did not lie to the officer or have any prior drug offenses. *Id.* at 257. There was also no smell of marijuana eminating from the car. *Id.* We held that although there was reasonable suspicion of intoxication, there was none relating to narcotics activity because "a reasonable suspicion that [the] appellant was hiding narcotics in the car could not

be rationally inferred from [those] facts." *Id.* But *McQuarters* is easily distinguishable because there was nothing in that case similar to Appellant's apparent drug transaction in the Waffle House parking lot or the information obtained from the confidential informant. *See id.* at 253–54, 257.

And in *Smith*, there was no evidence in the record to establish the informant's reliability, and the officers did not observe any other conduct that supported a reasonable suspicion of ongoing narcotics activity. *See* 58 S.W.3d at 790–91, 792–93. In other words, even though the reliability of a confidential informant is only part of an examination of the totality of the circumstances for purposes of determining reasonable suspicion, *Smith* hinged entirely on the informant's reliability because there were no other objective facts supporting reasonable suspicion. *Id.* at 789, 791–92. Unlike *Smith*, the informant in this case had provided Investigator Deweese with accurate information in the past— including information leading to at least one felony arrest; the informant had seen Appellant with methamphetamine within the previous week; and the officers observed Appellant engage in the apparent drug transaction at the Waffle House and become nervous, fidgety, and hesitant during the traffic stop.[6]

---

[6]Each of the other cases cited by Appellant is similarly distinguishable. None of the cases involved conduct similar to the transaction at the Waffle House, information such as that provided by the confidential informant, or both. *See Davis*, 947 S.W.2d at 241; *Sieffert*, 290 S.W.3d at 480–82; *St. George*, 197 S.W.3d at 812–14; *Herrera*, 80 S.W.3d at 286–87; *Klare*, 76 S.W.3d at 71; *see also Williams*, 812 S.W.2d at 47, 48–49 (noting that although the officer received information from an informant the day before, the officer observed nothing unusual or illegal at or near the time he stopped the appellant).

The objective facts known to the officers on the scene at the time Appellant's initial traffic stop concluded, viewed in their totality, include the information from the confidential informant, Investigator Deweese's verification of Appellant's identity and vehicle, the apparent drug transaction at the Waffle Ho2444use, and Appellant's behavior during the initial traffic stop. These facts provided the officers with a substantial basis for concluding that Appellant was, had been, or soon would be involved in illegal narcotics activity. *See Ford*, 158 S.W.3d at 492–93; *1998 Toyota Land Cruiser*, 277 S.W.3d at 90–91; *Gonzales*, 2007 WL 1752130, at *4. Therefore, there was reasonable suspicion to justify Appellant's continued detention for an olfactory inspection of the outside of her vehicle. *See Ford*, 158 S.W.3d at 492–93; *1998 Toyota Land Cruiser*, 277 S.W.3d at 90–91; *Gonzales*, 2007 WL 1752130, at *4. We hold that the trial court did not abuse its discretion by denying Appellant's motion to suppress, and we overrule Appellant's sole issue.

## IV. Conclusion

Having overruled Appellant's sole issue, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL: DAUPHINOT, GARDNER, and WALKER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: June 23, 2011