# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-14-00320-CR

**Alfredo Ayala, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF COMAL COUNTY, 207TH JUDICIAL DISTRICT
### NO. CR2013-100, HONORABLE DIB WALDRIP, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Officer David Cantu initiated a traffic stop after observing Alfredo Ayala make a left turn in front of him that required Officer Cantu to slow his car down to avoid a collision. After talking with Ayala, Officer Cantu contacted Officer Terry Flugrath and asked Officer Flugrath to conduct an investigation to determine whether Ayala had committed the offense of driving while intoxicated. *See* Tex. Penal Code § 49.04 (setting out elements of offense). During the investigation, Officer Flugrath asked Ayala to perform several field-sobriety tests and learned that Ayala had previously been convicted twice of driving while intoxicated. *See id.* § 49.09(b)(2) (elevating offense level to third-degree felony if defendant has previously been convicted twice of driving while intoxicated). Officer Flugrath asked Ayala to voluntarily submit to a blood draw, and Ayala initially agreed but later revoked his consent. Consequently, Officer Flugrath arranged for a nurse at a hospital to take a blood sample without a warrant, and the sample was later analyzed to determine Ayala's blood-alcohol concentration.

After Ayala was charged with felony driving while intoxicated, he filed a motion to suppress the results of the blood analysis. A hearing was held on the motion outside the presence of the jury during the trial. Prior to and during the hearing on the motion to suppress, Officer Flugrath testified regarding the events leading up to and immediately following the blood draw. At the end of the hearing, the district court denied the motion to suppress. The record in this case does not contain an order overruling the motion or any accompanying findings of fact or conclusions of law, but when the district court made its ruling at the end of the hearing, it explained on the record that it believed that the results of the testing performed on the blood sample obtained without a warrant were admissible because the blood draw was authorized under what is commonly referred to as the mandatory-blood-draw statute and the implied-consent statute, because Ayala consented to the blood draw, and because there were exigent circumstances.

Following the district court's ruling, the trial reconvened. Ultimately, the jury found Ayala guilty of the charged offense. Ayala elected to have the district court assess his sentence, and the district court imposed a sentence of ten years' imprisonment but suspended imposition of the sentence and placed Ayala on community supervision for six years. *See id.* § 12.34 (setting out permissible punishment range for third-degree felony); Tex. Code Crim. Proc. art. 42.12, § 3 (providing for judge-ordered community supervision). After the district court rendered its judgment of conviction, Ayala appealed the district court's ruling on his motion to suppress. A few months after the trial concluded, the court of criminal appeals issued an opinion addressing warrantless blood draws and rejecting the State's argument that the mandatory-blood-draw and implied-consent provisions of the Transportation Code "form a valid alternative to the Fourth Amendment warrant requirement." *State v. Villarreal*, 475 S.W.3d 784, 793 (Tex. Crim. App. 2014).

2

In a single issue on appeal, Ayala contends that the district court erred by denying his motion to suppress. We will reverse the district court's judgment of conviction and remand the case for a new trial.

## STANDARD OF REVIEW

Appellate courts review a trial court's ruling on a motion to suppress for an abuse of discretion. *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013). Under that standard, the record is "viewed in the light most favorable to the trial court's determination, and the judgment will be reversed only if it is arbitrary, unreasonable, or 'outside the zone of reasonable disagreement.'" *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (quoting *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). Moreover, appellate courts apply "a bifurcated standard, giving almost total deference to the historical facts found by the trial court and analyzing *de novo* the trial court's application of the law." *State v. Cuong Phu Le*, 463 S.W.3d 872, 876 (Tex. Crim. App. 2015); *see Arguellez*, 409 S.W.3d at 662 (explaining that appellate courts afford "almost complete deference . . . to [a trial court's] determination of historical facts, especially if those are based on an assessment of credibility and demeanor"). "The same deference is afforded the trial court with respect to its rulings on application of the law to questions of fact and to mixed questions of law and fact, if resolution of those questions depends on an evaluation of credibility and demeanor." *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). "When the trial court does not file findings of fact concerning its ruling on a motion to suppress, we assume that the court made implicit findings that support its ruling, provided that those implied findings are supported by the record." *Ex parte Moore*, 395 S.W.3d 152, 158 (Tex. Crim. App. 2013). In addition, a trial court's ruling on

3

the motion will be upheld if it is correct under any theory of law applicable to the case regardless of whether the trial court based its ruling on that theory. *Story*, 445 S.W.3d at 732. Further, appellate courts "view the evidence in the light most favorable to the" trial court's ruling. *State v. Robinson*, 334 S.W.3d 776, 778 (Tex. Crim. App. 2011).

## DISCUSSION

In a single issue on appeal, Ayala contends that the district court erred by denying his motion to suppress because the warrantless blood draw violated his Fourth Amendment rights. In support of the district court's ruling, the State argues that the blood draw was authorized under the implied-consent statute and the mandatory-blood-draw statute, that exigent circumstances existed that justified the warrantless blood draw, and that Ayala consented to the blood draw. In addition, the State asserts that in the event that this Court determines that the evidence of the blood analysis should have been suppressed, we should still uphold Ayala's conviction because he was not harmed by that error.

**Mandatory-Blood-Draw Statute and Implied-Consent Statute**

As set out above, the State argues that the results of the blood draw were admissible because the warrantless blood draw was authorized by the mandatory-blood-draw statute and because Ayala is deemed to have consented to the taking of a specimen of his blood under the implied-consent statute. *See* Tex. Transp. Code §§ 724.011(a) (specifying that person arrested for driving while intoxicated "is deemed to have consented . . . to submit to the taking of one or more specimens of the person's breath or blood"), .012(a)(1), (b)(3) (requiring taking of specimen if person is arrested

4

for driving while intoxicated and if police officer receives information that person has previously been convicted twice of driving while intoxicated). Further, the State asserts that the blood draw was authorized under the special-needs exception and under the search-incident-to-arrest exception.

In light of the analyses from *Villarreal* and from subsequent opinions by this Court applying *Villarreal*, we must conclude that the warrantless blood draw at issue was not authorized under the mandatory-blood-draw and implied-consent provisions of the Transportation Code. 475 S.W.3d at 793; *see State v. Molden*, No. 03-14-00166-CR, 2016 WL 690795, at *3 (Tex. App.—Austin Feb. 17, 2016, pet. filed) (applying *Villarreal* and overruling State's arguments). Furthermore, in *Villarreal*, the court of criminal appeals determined that the special-needs exception was inapplicable "when the search of a DWI suspect's blood is undertaken by law-enforcement officers for the primary purpose of generating evidence to be used in a criminal prosecution," 475 S.W.3d at 807, and that the search-incident-to-arrest exception was inapplicable "because that exception to the warrant requirement applies only if such a search is 'substantially contemporaneous' with the arrest and is confined to the area within the immediate control of the arrestee" and because "there is no possibility of that evidence being subject to sudden destruction or disappearance as a result of any active efforts by a defendant," *id.* at 807-08. In light of that controlling authority, we similarly reject the State's reliance on those exceptions in this case.

In its brief, the State contends that even if the results of the blood draw were not admissible under the provisions of the Transportation Code as an exception to the warrant requirement, the evidence should not have been excluded under the federal exclusionary rule. *See Illinois v. Krull*, 480 U.S. 340, 347 (1987) (discussing federal exclusionary rule). Specifically,

5

the State urges that an exception to the exclusionary rule applies because Officer Flugrath acted in good faith by relying on the mandatory-blood-draw and the implied-consent provisions to obtain the sample.[1]

Previously, this Court determined that "an officer cannot rely in good faith on Texas's implied consent or mandatory blood draw statute to justify a warrantless blood draw because, '[a]lthough the statute states an officer shall take a blood draw if'" certain conditions have been met, "'it does not *mandate* that he do so without a warrant.'" *Roop v. State*, No. 03-13-00141-CR, 2016 Tex. App. LEXIS 1541, at *16 (Tex. App.—Austin Feb. 17, 2016, pet. filed) (quoting *Huff v. State*, 467 S.W.3d 11, 34 (Tex. App.—San Antonio 2015, pet. filed)). Accordingly, we could not conclude that the officer "'acted in good faith when he failed to obtain a warrant based upon a statute that does not dispense with the warrant requirement.'" *Id.* (quoting *Huff*, 467 S.W.3d at 35).

---

[1] In an alternative argument, the State contends that Ayala "waived his ability to" assert that the good-faith exception to the federal exclusionary rule does not apply because he "failed to raise these arguments to overcome any good faith reliance of officers at trial." The State does not refer to any authority establishing a waiver under these circumstances. When moving to suppress the evidence at issue, Ayala presented evidence establishing that the blood draw was performed without a warrant and argued that the sample was taken in violation of his Fourth Amendment rights. Because "the prosecution bears the burden of showing that unlawfully obtained evidence is admissible under an exception to the federal exclusionary rule," *St. George v. State*, 197 S.W.3d 806, 824-25 (Tex. App.—Fort Worth 2006), *aff'd*, 237 S.W.3d 720 (Tex. Crim. App. 2007), we cannot agree with the State's assertion that Ayala somehow waived any argument regarding whether an exception to the federal exclusionary rule applied. Further, we note that when this Court was confronted with a similar issue regarding the Texas statutory exclusionary rule, we rejected the contention that the defendant "waived any argument that the evidence, while not subject to the federal exclusionary rule, should be excluded under" the Texas statutory exclusionary rule because "[n]othing in the text of article 38.23 suggests that this provision must be specifically cited to in order for evidence to be suppressed under Texas's exclusionary rule" and because "the State has not cited any authority supporting such a theory." *See Roop v. State*, No. 03-13-00141-CR, 2016 Tex. App. LEXIS 1541, at *17 n.5 (Tex. App.—Austin Feb. 17, 2016, pet. filed).

Furthermore, we explained that "even if the federal exclusionary rule would not prevent the admission of [the] blood draw results, these results should be suppressed under Texas's statutory exclusionary rule, which does not have an exception for good faith reliance on a statute." *Id.*; *see Molden*, 2016 WL 690795, at *3-4 (rejecting State's claims that blood-test results obtained from warrantless blood draw should not have been excluded under either federal exclusionary rule or Texas statutory exclusionary rule); *see also* Tex. Code Crim. Proc. art. 38.23 (providing that evidence obtained in violation of United States Constitution, federal law, Texas Constitution, or Texas law may not "be admitted in evidence against the accused on the trial of any criminal case" and containing single exception to rule if "the evidence was obtained by a law enforcement officer acting in objective good faith reliance *upon a warrant*") (emphasis added).

For those same reasons, we also reject the State's arguments that the results of the blood draw should not have been excluded.

**Consent**

In its brief, the State contends that even if the blood draw was not permissible under the mandatory-blood-draw and implied-consent statutes, the warrantless blood draw was authorized under an exception to the general warrant requirement because Ayala did in fact consent to the blood draw. When explaining its ruling as it pertained to consent, the district court stated that Ayala consented when he decided to provide a sample because he "didn't want anybody restraining him."

"The voluntariness of a person's consent is a question of fact that the state must prove by clear and convincing evidence," and a "trial court's finding of voluntary consent is reviewed for abuse of discretion[] and must be accepted on appeal unless it is clearly erroneous." *Walker v. State*,

469 S.W.3d 204, 211 (Tex. App.—Tyler 2015, pet. ref'd). A determination regarding whether consent was made voluntarily is achieved by analyzing "the totality of the circumstances of the situation from the point of view of an objectively reasonable person, including words, actions, or circumstantial evidence." *Tucker v. State*, 369 S.W.3d 179, 185 (Tex. Crim. App. 2012). Consent is not voluntary if the evidence shows the consent was "'no more than acquiescence to a claim of lawful authority.'" *Carmouche v. State*, 10 S.W.3d 323, 331 (Tex. Crim. App. 2000) (quoting *Bumper v. North Carolina*, 391 U.S. 543, 549 (1968)). Stated differently, for consent to be effective, it must "'not be coerced, by explicit or implicit means, by implied threat or covert force.'" *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973)). The critical question is whether the person's will was overborne. *Meekins v. State*, 340 S.W.3d 454, 459 (Tex. Crim. App. 2011). "[T]o constitute a valid waiver of Fourth Amendment rights through consent, a suspect's consent to search must be freely and voluntarily given." *Villarreal*, 475 S.W.3d at 799.

Prior to the district court making its ruling on the motion to suppress, Officer Flugrath testified regarding the events leading up to the blood draw. As discussed above, some of that testimony occurred in a hearing held outside the presence of the jury. In his testimony, Officer Flugrath related that Ayala agreed to provide a blood sample shortly after he was arrested and that Officer Flugrath drove Ayala to a local hospital to obtain the sample. Next, Officer Flugrath explained that when they arrived at the hospital, Ayala communicated that he disliked that hospital and would not allow anyone who worked there to touch him. When describing this exchange, Officer Flugrath agreed that Ayala revoked his consent when they arrived at the hospital and related that once they arrived at the hospital, Ayala said "that he was no longer going to provide a voluntary blood sample

8

. . . [and] wanted to go to the jail and have it drawn there" because a friend or family member had died at the hospital and because he did not want anyone at the hospital "to touch him." In addition, Officer Flugrath explained that because it was not possible to have blood drawn at the jail, he escorted Ayala into the hospital. During the trial, a video recording from Officer Flugrath's patrol car was admitted and played for the jury, and that recording is generally consistent with the testimony that the officer provided at trial.

When describing the blood draw, Officer Flugrath related that Ayala "[i]nitially . . . did object" and became combative, that Officer Flugrath and another officer physically "had to restrain him" to allow a nurse to obtain a sample, that the nurse was unable to obtain a sample due to the way that Ayala was being restrained, that Officer Flugrath and the other officer were going to reposition Ayala to get the sample, that Ayala said that he would "quit fighting" and allow the nurse to obtain the sample, and that the nurse was then able to obtain a sample without Ayala being restrained.

Although Ayala initially agreed to submit a blood sample, he revoked that consent when he and Officer Flugrath arrived at the hospital. *See id.* at 799-800 (explaining that "necessary element of valid consent is the ability to limit or revoke it" and that "[i]t would be wholly inconsistent with these principles to uphold the warrantless search of a suspect's blood on the basis of consent when a suspect has . . . expressly and unequivocally refused to submit to the search"). Moreover, although the district court determined that Ayala later agreed to allow the sample to be taken, that submission did not occur until after Ayala had been held down and positioned by two police officers and was made in response to the officers' decision to attempt to reposition Ayala to allow the blood draw to proceed. Viewing the totality of the circumstances "from the point of view

9

of an objectively reasonable person," *see Tucker*, 369 S.W.3d at 185, we must conclude that the evidence shows that Ayala's "consent" was invalid because it constituted nothing "'more than acquiescence to a claim of lawful authority,'" *Carmouche*, 10 S.W.3d at 331 (quoting *Bumper*, 391 U.S. at 549).

For these reasons, we must conclude that the district court abused its discretion by concluding that Ayala consented to the blood draw.[2]

---

[2] In its brief, the State asserts that Ayala did not actually revoke his consent because he only refused to provide a sample at the hospital after learning that he had been driven to a hospital instead of to the Sheriff's Department and did not expressly state that he was refusing to provide a sample at the Sheriff's Department as well. The issue of whether Ayala would have agreed to provide a sample somewhere else is not before us. Instead, we must consider in this issue whether Ayala consented to the blood draw actually performed. Moreover, the video recording from Officer Flugrath's patrol car and the testimony from Officer Flugrath demonstrated that Ayala clearly and repeatedly communicated that he was not consenting to the blood draw at issue.

In a related argument, the State contends that Ayala "lacked the capacity to withdr[a]w his consent" because of his level of intoxication and asserts that Ayala's blood-alcohol concentration may have increased from the time that he agreed to provide the sample to the time that he changed his mind. As support for this argument, the State points to section 724.014 of the Transportation Code, which provides that a "person who is dead, unconscious, or otherwise incapable of refusal is considered not to have withdrawn the consent provided by" the implied-consent statute. *See* Tex. Transp. Code § 724.014(a). As a preliminary matter, we note that no argument was made before the suppression ruling that the blood draw was authorized under section 724.014 because Ayala was incapable of refusing to consent to a blood draw, and the district court expressed no determination on that issue when it made its ruling. Moreover, as will be discussed more thoroughly later in the opinion, only a few minutes passed between when Ayala agreed to provide a sample after his arrest and when he changed his mind after arriving at the hospital. Furthermore, even agreeing with the State for the sake of argument in this issue that the video recordings and the testimony from the officers showed that Ayala was intoxicated and confused regarding his location, the video and the testimony did not establish that Ayala was incapable of refusing to consent to the blood draw. On the contrary, as discussed above, Ayala clearly communicated his refusal to submit to the blood draw. Finally, although the court of criminal appeals did not discuss section 724.014 in *Villarreal*, it seems safe to assume that the analysis from that case would not authorize a warrantless blood draw under that provision in the absence of a recognized exception to the general warrant requirement. *Compare State v. Ruiz*, No. 13-13-00507-CR, 2015 Tex. App. LEXIS 8961, at *8-13 (Tex.

**Exigent Circumstances**

In its final set of arguments regarding the propriety of the blood draw, the State asserts that the warrantless blood draw was authorized under another exception to the general warrant requirement. In particular, the State contends that the blood draw was permissible because there were exigent circumstances present.

When seeking to suppress evidence on the ground that it was obtained in violation of the Fourth Amendment, a defendant has the initial burden of rebutting "the presumption of proper police conduct," but if the defendant meets this burden by showing that the search was done "'without a warrant,'" the State has the burden of proving that the search "was nonetheless reasonable under the totality of the circumstances." *Amador v. State*, 221 S.W.3d 666, 672 (Tex. Crim. App. 2007) (quoting *Russell v. State*, 717 S.W.2d 7, 9 (Tex. Crim. App. 1986)). A search without a warrant may be proper "'when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment.'" *Missouri v. McNeely*, 133 S. Ct. 1552, 1558 (2013) (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011) and omitting internal quotation marks and brackets). When "determining whether a warrantless

App.—Corpus Christi Aug. 27, 2015, no pet.) (determining that State did not meet its burden of establishing reasonableness of warrantless blood draw under section 724.014 when defendant was unconscious and noting that section 724.014 does not provide voluntary consent), *with Miller v. State*, 387 S.W.3d 873, 880-81 (Tex. App.—Amarillo 2012, no pet.) (determining that trial court did not err by denying motion to suppress because trial court could have determined that defendant was unconscious and, therefore, did not withdraw consent to warrantless blood draw under section 724.014), *and Anderson v. State*, No. 03-09-00041-CR, 2010 Tex. App. LEXIS 7043, at *6-8 (Tex. App.—Austin Aug. 26, 2010, pet. ref'd) (mem. op., not designated for publication) (concluding pre-*Villarreal* that warrantless blood draw was permissible because defendant either consented or because he was asleep and was deemed to have consented under section 724.014).

11

search is justified," appellate courts apply an objective standard based on "the facts and circumstances known to the police at the time of the search." *See Colburn v. State*, 966 S.W.2d 511, 519 (Tex. Crim. App. 1998); *Roop*, 2016 Tex. App. LEXIS 1541, at *9. Moreover, appellate courts review "a trial court's application of the law of search and seizure to the facts *de novo*," *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010), including "the legal question of whether" a warrantless search was justified by the presence of exigent circumstances, *Roop*, 2016 Tex. App. LEXIS 1541, at *6; *see Evans v. State*, No. 14-13-00642-CR, 2015 WL 545702, at *6 (Tex. App.—Houston [14th Dist.] Feb. 10, 2015, pet. filed) (mem. op., not designated for publication) (providing that "[a]lthough all findings of historical fact supported by the record must be implied in favor of the trial court's ruling that the blood draw should not be suppressed, whether those facts meet the legal standard of exigent circumstances is a legal question that is reviewed de novo").

Regarding driving-while-intoxicated cases, the Supreme Court has determined that "the natural metabolization of alcohol in the bloodstream" does not present "a *per se* exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases." *McNeely*, 133 S. Ct. at 1556; *see also id.* at 1561 (distinguishing evidence of intoxication from other destruction-of-evidence situations in which police must act more quickly because blood-alcohol evidence "from a drunk-driving suspect naturally dissipates over time in a gradual and relatively predictable manner"); *cf. Evans*, 2015 WL 545702, at *6 (determining that accident investigation, without more, is not exigent circumstance). On the contrary, the Court explained that "the reasonableness of a warrantless search under the exigency exception to the warrant requirement must be evaluated based on the totality of the circumstances." *McNeely*,

12

133 S. Ct. at 1560. Moreover, the Court reasoned that reviewing courts should bear in mind that advances in technology and improvements to the warrant process have "allow[ed] for the more expeditious processing of warrant applications, particularly in contexts like drunk-driving investigations where the evidence offered to establish probable cause is simple." *Id.* at 1561-62. Further, the Court noted that although "the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case" and although "exigent circumstances justifying a warrantless blood sample may arise in the regular course of law enforcement due to delays from the warrant application process," *id.* at 1563, "[i]n those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so," *id.* at 1561.

When the district court denied Ayala's motion to suppress, it determined that there were exigent circumstances present. In particular, the district court determined that "there is a little bit more than the mere dissipation issue as far as exigency" because Ayala "attempted to manipulate the situation to say, I'll voluntarily allow blood to be drawn" and "added to any potential dissipation of alcohol in the blood."

The district court's finding is a reference to testimony from Officer Flugrath in which he described how he asked Ayala to provide a voluntary blood sample after Ayala was placed under arrest and how Ayala changed his mind when they reached the hospital. As set out earlier, a video recording of Officer Flugrath's interaction with Ayala was admitted into evidence and played for the jury. The recording is generally consistent with Officer Flugrath's testimony and shows that it took approximately ten minutes for Officer Flugrath to drive Ayala from the scene of the traffic stop to

13

the hospital and that Ayala communicated to Officer Flugrath that he no longer wanted to have his blood drawn when they arrived at the hospital. When describing the process for obtaining a warrant if he had elected to pursue one, Officer Flugrath estimated that it would have taken him fifteen minutes to transport Ayala to jail.

Even though we must defer to the district court's credibility determination that Ayala changed his mind to cause a delay in the process, we cannot conclude that this type of brief delay, without more, would justify a warrantless blood draw under the exigent-circumstances exception in light of the Supreme Court's directive in *McNeely* that the Fourth Amendment "mandates" that a warrant be obtained to collect a blood sample in situations where an officer can reasonably obtain a warrant and in light of the Supreme Court's instruction that an individual's blood-alcohol concentration "naturally dissipates over time in a *gradual* and relatively predictable manner." 133 S. Ct. at 1561 (emphasis added). This seems particularly true in this case where, as will be discussed later, the evidence established that Ayala was arrested approximately 30 minutes after the traffic stop was initiated, that Ayala arrived at the hospital within 45 minutes of being pulled over by Officer Cantu, and that Ayala's blood was taken within approximately 20 minutes of his arrival at the hospital.

Although the district court did not specify any other additional findings supporting its determination that exigent circumstances authorized the warrantless blood draw, we review the remainder of the record to determine whether the record before the district court when it made its ruling supports any implied findings regarding the presence of exigent circumstances. *See Ex parte Moore*, 395 S.W.3d at 158; *see also Black v. State*, 362 S.W.3d 626, 635 (Tex. Crim. App. 2012)

14

(providing that "appellate review of [a trial court's] ruling on the motion to suppress is ordinarily limited to that evidence . . . that was before the court at the time of its decision").

Before the district court ruled on the motion to suppress, Officer Cantu testified in front of the jury regarding his decision to initiate a traffic stop, and Officer Flugrath testified regarding the events leading up to and following the blood draw both in the presence of the jury and in a hearing held outside the presence of the jury.

In his testimony, Officer Cantu recalled that "Ayala pulled his car out in front of mine" and in front of two other cars traveling in the opposite direction, that he had to slow his vehicle down "to avoid any impact," that one of the cars traveling in the opposite direction also had to slow down "to avoid any type of collision," that Officer Cantu observed Ayala's car "starting to ride the center stripe lane" after Ayala pulled out in front of him, and that Officer Cantu "elected to conduct a traffic stop" at that time "for failing to yield right-of-way as [Ayala] turned left." Furthermore, Officer Cantu related that Ayala admitted to having consumed "two or three" beers and to having consumed beer as recently as 30 to 45 minutes before the traffic stop. During Officer Cantu's testimony, a video from Officer Cantu's dashboard camera was played for the jury and is consistent with Officer Cantu's testimony regarding the alleged failure to yield and regarding his interaction with Ayala.

After Officer Cantu finished testifying, Officer Flugrath was called to the stand. In his testimony, Officer Flugrath related that the manner in which Ayala was driving was dangerous and could have resulted in a collision and injuries, but he also agreed that no accident occurred and that Officer Cantu was able to safely stop. In addition, Officer Flugrath initially agreed that there

15

was no emergency and were no exigent circumstances present in this case because there was no car accident and because there were no injuries involved.  Later in his testimony, Officer Flugrath reiterated that there was no emergency but stated that there were exigent circumstances without further clarifying his statement.  When describing his interaction with Ayala, Officer Flugrath explained that Ayala admitted to consuming up to five beers before the traffic stop.

Moreover, Officer Flugrath testified that the traffic stop was initiated at 12:14 a.m., that Ayala was arrested at 12:40 a.m., and that the blood draw occurred at 1:20 a.m.  The video recording from Officer Flugrath's patrol car shows that Officer Flugrath and Ayala left the scene of the traffic stop at 12:51 a.m. and arrived at the hospital at 12:59 a.m.  In his testimony, Office Flugrath related that he did not request a search warrant, did not ascertain whether a magistrate was available to issue a warrant, and did not ask any other officer to help him obtain a warrant even though Officer Cantu and another officer were at the scene of the traffic stop.  When discussing why he did not take those actions, he testified that he was relying on the mandatory-blood-draw statute to obtain a sample without a warrant.  However, Officer Flugrath testified that he knew the process for obtaining a warrant, had the contact information for several magistrates, and could have driven Ayala to the Sheriff's Department in order to fill out "paperwork for an affidavit for a search warrant for blood" if he were not relying on the mandatory-blood-draw statute.  In addition, as discussed earlier, Officer Flugrath related that there was another officer at the hospital who helped him obtain the blood sample.

When describing the process for obtaining a warrant if he had elected to pursue one, Officer Flugrath estimated that it would have taken him 15 minutes to transport Ayala to jail, that

16

he would have had to review the video of the field-sobriety tests for approximately 8 minutes, that he would have to spend between 25 and 30 minutes filing out paperwork for a warrant, and that he would then have to contact a magistrate. Regarding contacting a magistrate, Officer Flugrath explained that the amount of time that it takes "is a big variable" and can take anywhere between 5 minutes and 2 hours. Then, Officer Flugrath testified that he would have to fax a warrant to the magistrate and wait for a response, which typically takes 20 minutes. Next, Officer Flugrath described how if the magistrate approved the warrant, he would have had to transport Ayala to the hospital, which can take between 15 and 20 minutes; fill out paperwork at the hospital, which can take 10 minutes; and schedule a nurse to draw the blood, which can take between 10 to 40 minutes depending on how busy the nurses are. Although Officer Flugrath provided a wide range of time that it might have taken to secure a blood draw through a warrant, he summarized his testimony by stating that it would likely take two hours under ideal circumstances.

Considering the totality of the circumstances and viewing the facts in the light most favorable to the district court's ruling, we must conclude that the district court abused its discretion by concluding that the State met its burden of establishing that exigent circumstances existed that could have caused Officer Flugrath to reasonably believe that the further delay required to obtain a search warrant would jeopardize the efficacy of the evidence of Ayala's blood-alcohol concentration. According to the testimony and video recording, Ayala had been arrested within half an hour of the traffic stop, had been drinking as recently as 30 to 45 minutes before the traffic stop, had admitted to consuming multiple beers, had been transferred from the scene within a few minutes of his arrest, and had his blood drawn within approximately 35 minutes of his arrest. In addition, the video

17

reveals that Officer Flugrath was able to quickly leave the scene of the traffic stop after the field-sobriety testing had been completed and after Ayala had been arrested. *Cf. Schmerber v. California*, 384 U.S. 757, 770-71 (1966) (explaining that police officer could reasonably believe emergency existed, in part, because "time had to be taken . . . to investigate the scene of the accident"). Furthermore, although Officer Flugrath indicated that there might have been exigent circumstances and that Ayala had driven his car in a dangerous manner, Officer Flugrath testified that there was no emergency in this case, that there was no collision in this case, that no one was injured, and that he left the scene of the traffic stop approximately 30 minutes after the stop was initiated.

Moreover, although Officer Flugrath testified that it could have taken up to several hours to obtain a blood sample with a warrant, Officer Flugrath did not provide any testimony indicating that he was aware of any delays in obtaining a warrant on the night in question. Further, Officer Flugrath explained that there were other officers on the scene and that there was another officer at the hospital who helped him obtain a blood sample, but he did not testify that he sought their help or the help of any officer in attempting to secure a warrant either before or after Ayala revoked his consent. In addition, Officer Flugrath admitted that he made no attempt to obtain a warrant or determine whether a magistrate was available even though he knew the process for requesting a warrant, had the contact information for several magistrates, and had the ability to fax a request for a warrant to a magistrate and to similarly receive the warrant if the magistrate issued one. *Cf. McNeely*, 133 S. Ct. at 1561 (explaining that metabolization of alcohol is one factor to consider but also stating that if "warrant process will not significantly increase the delay before the blood test is conducted because an officer can take steps to secure a warrant while the suspect is

18

being transported to a medical facility by another officer," "there would be no plausible justification for an exception to the warrant requirement"); *see also id.* at 1562 (discussing advances in technology and changes in law allowing police officer to apply for search warrants remotely and streamlining warrant process).

Furthermore, we note that in a recent opinion, this Court upheld a determination that exigent circumstances were not present when an officer testified that it would take a similar amount of time to have attained a warrant where there was another officer present who could have been of assistance in obtaining a warrant. *See State v. Cuba*, No. 03-13-00779-CR, 2016 Tex. App. LEXIS 3084, at *19-22 (Tex. App.—Austin Mar. 25, 2016, no pet. h.) (mem. op., not designated for publication) (affirming trial court's determination that State failed to meet its burden when suspect was arrested within 30 minutes of accident, when warrantless blood draw occurred over one hour after arrest, and when police officer testified that it would have taken from one and half to three hours to obtain warrant because officer also testified that he had access to technology to help assist him in obtaining warrant and that there was another officer who was available to help him obtain warrant); *see also Schneider v. State*, No. 03-14-00189-CR, 2016 Tex. App. LEXIS 3505, at *16-18 (Tex. App.—Austin Apr. 6, 2016, no pet. h.) (mem. op., not designated for publication) (concluding that exigent circumstances were present in what was described as "not a typical DWI case" because it involved hit and run where there was three-hour delay between when accident occurred and when blood sample was taken, where delay was caused in part by "extra time [spent] investigating the case and determining whether" crime had occurred, and where testimony established that applying for warrant would have delayed process by additional two hours); *Pearson*

19

*v. State*, No. 13-11-00137-CR, 2014 Tex. App. LEXIS 2514, at *7-11 (Tex. App.—Corpus Christi Mar. 6, 2014, pet. ref'd) (mem. op., not designated for publication) (finding exigent circumstances justifying warrantless blood draw where officer responded to scene of car accident, where officer "was the only officer on duty that morning and . . . was solely responsible for securing the scene of the accident," where officer explained that he went to hospital "as soon as he completed his" "time-consuming and extensive" "duties at the accident scene," where officer arrived at hospital over five hours after he responded to scene of accident, and where it would have taken at least three additional hours to obtain warrant).

For these reasons, we must conclude that the district court abused its discretion by determining that exigent circumstances were present in this case that authorized the warrantless blood draw from Ayala.

In light of the precedent from the court of criminal appeals and from this Court establishing that the mandatory-blood-draw and implied-consent statutes do not provide an alternative to the general warrant requirement and given our conclusions that the exceptions to the general warrant requirement relied on by the district court did not apply, we must conclude that the blood sample was obtained in violation of Ayala's Fourth Amendment rights and sustain his issue on appeal asserting that the district court abused its discretion when it denied his motion to suppress.

**Harmless Error Analysis**

Having determined that the collection of Ayala's blood violated the Fourth Amendment, we must now consider whether the error requires a reversal of the district court's judgment of conviction.

20

The erroneous admission of evidence obtained in violation of the Fourth Amendment is constitutional error analyzed under Texas Rule of Appellate Procedure 44.2(a). *Long v. State*, 203 S.W.3d 352, 353 (Tex. Crim. App. 2006). Under Rule 44.2(a), an appellate court "must reverse a judgment of conviction unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." Tex. R. App. P. 44.2(a). "If there is a reasonable likelihood that the error materially affected the [fact finder]'s deliberations, then the error is not harmless." *McCarthy v. State*, 65 S.W.3d 47, 55 (Tex. Crim. App. 2001). "[T]he question for the reviewing court is not whether the jury verdict was supported by the evidence" but what is "the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations in arriving at that verdict." *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007). "The reviewing court should calculate, as nearly as possible, the probable impact of the error on the [fact finder] in light of the other evidence." *McCarthy*, 65 S.W.3d at 55.

Factors that appellate courts should consider in the analysis include, among others, "the nature of the error (*e.g.*, erroneous admission or exclusion of evidence, objectionable jury argument, etc.), whether it was emphasized by the State, the probable implications of the error, and the weight the jury would likely have assigned to it in the course of its deliberations." *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011); *see also Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000) (explaining that although most significant concern is error and its effects, "the presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error"). We consider whether "there was a reasonable possibility that the error, either alone or in context, moved the [fact finder] from a state of nonpersuasion to one of persuasion as to the issue in question." *Wesbrook*, 29 S.W.3d at 119.

Having reviewed the record, we cannot conclude beyond a reasonable doubt that the erroneous admission of the blood-alcohol testing did not contribute to the conviction or punishment. *See* Tex. R. App. P. 44.2(a). The results of the blood testing were referenced by the State during its opening and closing statements and during the testimony of three witnesses, and the jury charge instructed the jury that one way that it could determine that Ayala was intoxicated was through evidence establishing that Ayala had a blood-alcohol concentration of 0.08 or higher.

Regarding the jury charge, the jury was instructed, in accordance with the Penal Code, that a person is intoxicated "when he does not have the normal use of his mental or physical faculties by reasons of the introduction of alcohol . . . into his body" but also was instructed that a person is intoxicated if "he has an alcohol concentration of 0.08 or more grams of alcohol per 100 milliliters of his blood." *See* Tex. Penal Code §§ 49.01(2) (defining term "intoxicated"), .04(a) (explaining that individual commits offense if he "is intoxicated while operating a motor vehicle in a public place").

During its opening statement, the State outlined what the evidence would show regarding the manner in which Ayala was driving that night, regarding Ayala's performance on the field-sobriety tests, and regarding the events leading up to the blood draw, but the State also mentioned that a blood sample was collected and that testing was performed on the sample to ascertain what Ayala's blood-alcohol concentration was. Although the State did not specifically mention what the results were at that point, the State did assert that the evidence would establish that Ayala was intoxicated right after discussing the fact that the analyst who performed the blood testing would be testifying.

In addition, the results of the blood-draw analysis were discussed during the testimony of Jim Burris, who was a forensic scientist for the Texas Department of Public Safety and who

22

performed the testing; through the testimony of Ayala's common-law wife, April Davila; and through the testimony of Ayala's brother, Armando Ayala. During his testimony, Burris listed his credentials, described the manner in which blood samples are tested, and stated that the testing done on Ayala's sample revealed that he had a blood-alcohol concentration of 0.209, which is higher than the Texas legal limit of 0.08. Moreover, Burris testified that someone with a blood-alcohol concentration of 0.209 is intoxicated and would not have normal use of his mental and physical faculties. Next, Burris described the effects of alcohol on the body and how it slows reaction time and discussed how a study has shown that individuals with blood-alcohol levels that are much lower than the legal limit do "not have the normal use of their mental and physical faculties." During Burris's testimony, a copy of the blood-test results was admitted into evidence as an exhibit.

In her testimony, Davila explained that on the night in question, Ayala had three beers at the bar but was not intoxicated when they left. During the State's cross-examination, the State asked if she thought it was appropriate for someone with a blood-alcohol concentration of 0.209 to drive, and she replied that Ayala "was fine to drive." In his testimony, Armando similarly related that Ayala only had two beers while they were at the bar and that Ayala was not intoxicated on that evening. When the State cross-examined Armando, the State asked Armando if he knew that Ayala's blood-alcohol concentration was 0.209, and Armando answered that he was unaware.

During its closing, the State discussed the manner in which Ayala was driving his car and suggested that it would support a deadly-weapon finding by the jury, summarized the evidence from the witnesses and from the videos, urged that the evidence established that Ayala was intoxicated because he had lost control of his physical or mental faculties, and attempted to

23

undermine the credibility of the witnesses who testified for Ayala on the grounds that their testimonies were inconsistent with the video recordings and that Davila and Armando did not want Ayala to go to prison. However, the State also focused on the results of the blood testing. Specifically, the State referred to the actual "0.209" result nine times. Moreover, the State explained on a couple of occasions how the jury charge authorized the jury to convict Ayala of driving while intoxicated in three different ways. For example, the State explained as follows:

> If four of you believe that the defendant has lost the normal use of his mental faculties and only his mental faculties, then four can believe by introduction of alcohol or another substance that he's lost the normal use of his physical faculties as a result of alcohol or another drug in the body and then four of you believe that it was above .08 or higher, that is a unanimous verdict as far as guilt is concerned.

> So if you're back deliberating and, you know, one person, two persons just doesn't want to believe the blood results at a .209 but they believe in looking at the video, he clearly lost the normal use of his mental faculties, it's still a unanimous verdict as long as all 12 of you agree that under the law in Texas he was intoxicated.

The State also mentioned that the evidence showed that Ayala "lost his mental faculties" and got "to a .209" and then got "behind the wheel of the vehicle." In a different portion of the closing, the State discussed how Ayala "had a BAC of above 0.08. You've heard that evidence. You've seen that evidence. He's at a .209." Later, the State mentioned the results when it discussed the testimony of Burris in which Burris described the testing procedures that were employed, related that the result in this case was 0.209, and explained that a person's faculties start "to decline" at levels much lower than 0.209. Finally, after again stressing that Ayala was intoxicated under the three ways included in the jury charge and that he was operating a deadly weapon, the State mentioned that Ayala "was at a .209 and he cut out in front of two other cars with a passenger in the vehicle."

24

In its brief, the State refers to the testimony from Officers Cantu and Flugrath and to the video recordings from their patrol cars that were played during the trial and notes that the evidence shows that Ayala was driving his car in an unsafe manner, that he was angry and disoriented, that he had bloodshot eyes, that his breath smelled like alcohol, that he admitted to consuming as many as five beers before leaving the bar, that he admitted to being intoxicated at a level of 3 or 4 out of 10, that he had difficulty performing some of the field-sobriety tests, that he exhibited six of six indicators of intoxication during the horizontal-gaze-nystagmus test, that he exhibited six of eight indicators of intoxication during the walk-and-turn test, that he exhibited three of four indicators of intoxication on the one-leg-stand test, that he was unable to fully recite the alphabet in the correct order, that he was unable to accurately estimate the passage of thirty seconds with his eyes shut and with his head tilted back, that Officer Flugrath determined that Ayala was intoxicated, and that Ayala initially agreed to provide a blood sample but later changed his mind when he learned the blood draw would happen at a hospital rather than at the Sheriff's Department. *See Kirsch v. State*, 306 S.W.3d 738, 745 (Tex. Crim. App. 2010) (listing erratic driving, bloodshot eyes, slurred speech, swaying, and stumbling as indicators of intoxication and noting that admissions regarding how much accused had to drink can be indicative of intoxication); *Cotton v. State*, 686 S.W.2d 140, 143 n.3 (Tex. Crim. App. 1985) (stating that "odor of alcohol on the person" is evidence of intoxication); *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (providing that, in general, officer's testimony that accused was intoxicated is evidence of intoxication).

However, given that the jury charge included an instruction providing that the jury could find that Ayala was intoxicated if he had a blood-alcohol concentration of 0.08 or more, that

Burris testified that Ayala's alcohol concentration was 0.209 and was more than twice the legal limit, that the blood-alcohol report was admitted into evidence, that the State discussed the testing during its opening statement, that the State repeatedly emphasized in its closing what the results of the testing were, and that the State told the jury on more than one occasion that it could determine that Ayala was intoxicated based on the blood-test evidence, we cannot say beyond a reasonable doubt that the district court's error in admitting the evidence did not contribute to Ayala's conviction. *See* Tex. R. App. P. 44.2(a); *Weems v. State*, 434 S.W.3d 655, 667 (Tex. App.—San Antonio 2014, pet. granted) (determining that trial court's decision to deny motion to suppress and admit evidence of blood test was harmful when jury was given instruction regarding intoxication that included "*having an alcohol concentration of 0.08 or more*" and when toxicologist testified that defendant's alcohol concentration was 0.18 when sample was taken and was likely 0.24 at time of accident); *see also Garcia v. State*, Nos. 04-14-00389-CR, -00390-CR, 2015 Tex. App. LEXIS 7797, at *9-11 (Tex. App.—San Antonio July 29, 2015, no pet.) (mem. op., not designated for publication) (determining that ruling denying motion to suppress blood-testing results was harmful where State informed jury that person is intoxicated if he has alcohol concentration of 0.08 or more, where State told jury during opening statements that one way to find defendant guilty was if there was evidence showing blood-alcohol level of 0.08 or more, where toxicologist stated that legal intoxication occurs when person has alcohol level of 0.08 or more, where toxicologist testified that defendant had level of 0.187, where report chronicling results of blood test was admitted, where State emphasized blood results during its closing, and where jury instructions informed jury that one way for person to be legally intoxicated is if he has alcohol concentration of 0.08 or more).

For all of these reasons, we must conclude that the district court's ruling on Ayala's motion to suppress was not harmless error.

## CONCLUSION

Having sustained Ayala's issue on appeal that the warrantless blood draw violated his rights under the Fourth Amendment and having determined that the district court's ruling denying Ayala's motion to suppress was not harmless error, we reverse the district court's judgment of conviction and remand this matter to the district court for a new trial.

_____

David Puryear, Justice

Before Justices Puryear, Pemberton, and Field

Reversed and Remanded

Filed:  April 7, 2016

Do Not Publish

27